**Johnny Ray HOLLIE, Appellant,**

v.

**The STATE of Texas, State.**

**Nos. 2–97–151–CR, 2–97–152–CR.**

Court of Appeals of Texas,
Fort Worth.

April 16, 1998.

Tom Zachry, Fort Worth, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Helena F. Faulkner, Greg Miller, Jamie Cummings, Asst. Dist. Attys., Fort Worth, for Appellee.

Before CAYCE, C.J., and CHUCK MILLER (Sitting by Assignment) and LIVINGSTON, JJ.

## OPINION

PER CURIAM.

Appellant Johnny Ray Hollie was charged by two indictments with the offenses of aggravated sexual assault and robbery by causing bodily injury. In a trial of both offenses, he pleaded not guilty to each and a jury, after hearing evidence, found him guilty of both offenses. At the completion of the punishment stage of the trial, the jury assessed his punishment in the sexual assault case at confinement for twenty-two years and in the robbery case for seven years, both in the Institutional Division of the Texas Department of Criminal Justice. The jury however recommended that the sentence in the robbery case be suspended and that Hollie be placed on probation. Sentences were ordered to run concurrently. On appeal Hollie brings one point complaining that the trial judge committed reversible error in allegedly coercing a verdict out of the jury, in violation of Hollie's constitutional rights. We affirm.

Trial commenced on Wednesday, January 22, 1997 with voir dire. Testimony began at

9 a.m. on Thursday, January 23, and continued until a weekend recess was declared at the close of the testimony at 3 p.m. on Friday, January 24. On Monday, January 27, the charge was read to the jury and oral argument was had. The jury retired to deliberate at 11:45 a.m. The jury lunched from 12:30 to 1:30 on that day and deliberated until 4:30 when they sent the following note to the trial court:

■■■ "We have eleven for guilty, one for not guilty. Not guilty party unable and not willing to state concerns or change mind." The trial court overruled Hollie's motion for mistrial,[1] urged on grounds that the jury was deadlocked, and proceeded to outline to the parties and the jury the procedure it was going to follow. Thereafter the court followed its previously announced procedure and excused the jury for the night, brought them back the next morning, gave them an additional charge telling them to try to reach a verdict, and told them to deliberate further and to let the court know in an hour what progress had been made. All of this was done over Hollie's objection. Within the hour the jury returned a unanimous verdict of guilty.

It is the events that transpired during jury deliberations that form the basis for Hollie's point. Hollie complains that by giving the additional charge after being informed that the vote was 11–1 in favor of guilt, the trial court was coercing the holdout juror, commenting on the weight of the evidence, and depriving Hollie of his Constitutional right to an impartial jury.

The additional charge given over Hollie's objection by the trial court on Tuesday morning was as follows:

This is in response to your note which I have designated Jury Note No. 2 in which you indicate that you are at a real impasse. If this jury finds itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial and discharge the jury.

This indictment will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such future jury will be empaneled in the same way this jury has been empaneled and will likely hear the same evidence which has been presented to this jury. The questions to be determined by that jury will be the same questions confronting you and there is no reason to hope the next jury will find these questions any easier to decide than you have found them.

With this additional instruction, you are instructed to continue deliberations in an effort to arrive at a verdict that is acceptable to all members of the jury, if you can do so without doing violence to your conscience.

This type of charge, commonly given to juries that seem to have reached an impasse in their deliberations, is popularly referred to as an *Allen* charge because of the Supreme Court case of that name. *See Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528, 530–31 (1896)[2]. The charge given in *Allen v. United States* was identical to instructions previously given in

---

1. Although this ruling is not raised as a separate ground for reversal, we note that a trial judge has broad discretion, upon finding that a jury is deadlocked or at a voting impasse, to either declare a mistrial or order the jury to continue deliberating. *See Wade v. Hunter*, 336 U.S. 684, 689–90, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949); *Green v. State*, 840 S.W.2d 394, 407 (Tex.Crim.App.1992); *Montoya v. State*, 810 S.W.2d 160, 166 (Tex.Crim.App.1989). Trial courts may discharge a jury when, considering all the circumstances, there is a manifest necessity for doing so, or the ends of public justice would otherwise be defeated. *See Wade*, 336 U.S. at 689–90, 69 S.Ct. at 837, 93 L.Ed. at 978. Among the factors to be considered are the length of the trial and the amount of evidence

presented to the jury. *See Green*, 840 S.W.2d at 407.

2. In this opinion, reference to an "Allen charge" refers generically to supplemental jury instructions that urge deadlocked juries to rethink their differences in order to reach a unanimous verdict. Such a charge has also been colloquially referred to as a dynamite or hammer charge. The federal circuit courts commonly give the term "Allen charge" this meaning, as do the state courts. *See Boyd v. Scott*, 45 F.3d 876, 878 n. 1, (5th Cir.1994), *cert. denied*, 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 855 (1995); *Ex parte Menchaca*, 854 S.W.2d 128, 132 n. 3 (Tex.Crim. App.1993).

Connecticut state trial courts and sanctioned by their state supreme court. *See id.,* 164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 530–31. This charge was of the following tenor:

> Although the verdict to which each juror agrees must, of course, be his own conclusion and not be a mere acquiescence in the conclusions of his fellows, yet in order to bring twelve minds to a unanimous result, the jurors should examine with candor the questions submitted to them and with due regard and deference to the opinions of each other. In conferring together the jury ought to pay proper respect to each other's opinions, and listen with candor to each other's arguments. If much the larger number of the panel are for a conviction, a dissenting juror should consider whether the doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with equal desire to arrive at the truth, and under the sanction of the same oath. And on the other hand, if the majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the conclusions of a judgement which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

*State v. Smith,* 49 Conn. 376, 386 (1881). *See also Allen,* 164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 531.

This type of charge was justified by the Supreme Court in *Allen* with the following reasoning:

> While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgement, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself.[3]

*Allen,* 164 U.S. at 501–02, 17 S.Ct. at 157. Thus, the trial court's instructions to the jury were held to be proper. To this day, the federal circuit courts ·have generally approved modified *Allen* charges that are no more coercive than the original *Allen* charge. *United States v. Handy,* 454 F.2d 885, 889 (9th Cir.), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972).

Hollie urges that coercion is the issue looked at when an appellate court reviews a trial wherein a modified *Allen* charge was given. He maintains that the combination of the *Allen* charge and the fact that the trial court knew the numerical split within the jury, coalesced to have a coercive effect on the holdout juror. Because he has found no Texas cases factually on point, Hollie cites and relies on the three following federal cases.

In *Brasfield v. United States,* the Supreme Court dealt with the subject of coercive effects of communications with a deliberating jury. *See Brasfield v. United States,* 272 U.S. 448, 450, 47 S.Ct. 135, 135–36, 71 L.Ed. 345, 346 (1926). In *Brasfield,* the jury had informed the court it was unable to agree on a verdict and the trial court inquired as to what the numerical split was, but was careful to not ask how many were voting for guilty and how many were voting for not guilty. *See id.,* 272 U.S. at 449, 47 S.Ct. at 135, 71 L.Ed. at 346. In reversing the case for the mere asking of such a question, the Supreme Court stated:

> We deem it essential to the fair and impartial conduct of the trial that the inquiry

---

**3.** The masculine gender permeates the language of the day because prior to the 1900s, females were generally not allowed to sit on juries.

itself should be regarded as ground for reversal. Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive. It can rarely be resorted to without bringing to bear in some degree, serious, although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned.

*Brasfield*, 272 U.S. at 450, 47 S.Ct. at 135–36, 71 L.Ed. at 346. Thus the practice of requesting information about how the jury was split was discarded, at least in federal criminal trials. Still, often a jury in its note informing a judge that it is unable to agree on a verdict will *volunteer* the extent of the split. Such is the situation in the case at bar.

In a case where knowledge of a hung jury's split was volunteered to the trial court, the *Allen* charge was found to be coercive in the Ninth Circuit, based in part on *Brasfield*. *United States v. Sae–Chua*, 725 F.2d 530, 531–32 (9th Cir.1984). In *Sae–Chua*, the jury informed the trial court sua sponte that they were deadlocked 11–1 in favor of guilt. *See id.* at 531. The trial court brought the jury into the courtroom and polled the jurors about whether they thought further deliberations might result in a verdict. *See id.* All but one, presumably the lone holdout, said that they thought further deliberations would result in a unanimous verdict. *See id.* The trial court then proceeded to give the jury a modified *Allen* charge and later in the day the jury returned a unanimous guilty verdict. *See id.* The Ninth Circuit reversed because the trial judge knew the numerical split, the fact that the majority was in favor of conviction, and even the probable identity of the

dissenter. *See id.* at 532. Because the dissenting juror was aware that the judge possessed this knowledge, and thus would likely believe that the *Allen* charge was directed *at him,* the inescapable notion that the judge was urging the lone dissenter to reconsider his vote was so inherently coercive that no post verdict juror testimony was needed to cause a reversal and re-trial. *See id.*

In *United States v. Ajiboye,* the Ninth Circuit further interpreted *Sae–Chua.* *Ajiboye,* 961 F.2d 892, 894 (9th Cir.1992). After first setting out the law that a trial judge's decision to give an *Allen* charge will be upheld on appeal unless it is clear from the record that the charge had an impermissibly coercive effect on the jury, the Ninth Circuit added that if a trial judge solicits the numerical division from a jury and then gives an *Allen* charge, the charge is per se coercive and such actions require reversal. *See id.* at 893–94 (citing *Brasfield,* 272 U.S. at 450, 47 S.Ct. at 135–36). Then the court moved to the more problematic area in between: the *Sae–Chua* situation where the trial judge does not solicit information about the split but none-the-less is informed about it by the jury. *See id.* The appellate court concluded that where the holdout juror's identity is not known to the trial court, and therefore the court did not know that it was *he* who was the holdout, then under those circumstances no juror could think that the *Allen* charge was delivered specifically at that juror and thus there could be no coercion. *See id.* at 894. Other factors that were important in finding a lack of coercion were that the trial court gave the *Allen* instruction only once;[4] the jury deliberated for a long while after the *Allen* charge was given; the jury asked for some testimony to be read back after the *Allen* charge was given; and finally that part of the trial judge's instructions were to not "surrender an honest conviction as to the weight and effect of the evidence simply to reach a verdict." *See id.*

The Supreme Court has had recent occasion to revisit this area in a case involving an attack on an *Allen* charge coupled with a

---

**4.** It is also a practice among some trial judges to give a "mild" version of the *Allen* charge to a jury and if that does not result in a unanimous

verdict to give a "stronger" version making a more forceful pitch that the jury reach a decision.

polling of the jury, wherein violation of constitutional rights were alleged.[5] *See Lowenfield v. Phelps*, 484 U.S. 231, 239–41, 108 S.Ct. 546, 551–52, 98 L.Ed.2d 568, 576–79 (1988). Noting that the continued viability of their observations in *Allen* were beyond dispute, the Court noted that *Brasfield* was not a constitutional law case and had no precedential value in an attack on a conviction based on constitutional grounds such as occurs in habeas corpus matters. *See id.*, 484 U.S. at 239–40, 108 S.Ct. at 552, 98 L.Ed.2d at 578.

The State points out that Hollie's reliance on the Ninth Circuit cases of *Sae–Chua* and presumably *Ajiboye* is misplaced because they rely on *Brasfield*'s holding, and that holding is but "a prophylactic rule forbidding the federal trial courts from questioning deadlocked juries regarding numerical division." Indeed, every federal circuit court of appeals that has addressed the issue has held that *Brasfield*'s per se rule does not apply in an attack on constitutional grounds, although the per se rule is apparently still valid as a Supreme Court supervisory reversal doctrine in appeals from federal criminal convictions. *See Montoya v. Scott*, 65 F.3d 405, 412 (C.A.5 1995), *cert. denied*, 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). Our own Court of Criminal Appeals has also so held. *See Howard v. State*, 941 S.W.2d 102, 124 (Tex.Crim.App.1996).

*Brasfield* is still, in the eyes of the Supreme Court, instructive as to the issue of jury polling. *See Lowenfield*, 484 U.S. at 240, 108 S.Ct. at 552, 98 L.Ed.2d at 578–79. In *Lowenfield*, the trial court asked the jury members to signify in individual signed written secret ballots whether they each thought further deliberations would enable them to reach a verdict. *See id.*, 484 U.S. at 234–35, 108 S.Ct. at 549, 98 L.Ed.2d at 575–76. Eleven of the twelve individual signed slips indicated a positive answer, while one indicated a negative one, and so the trial court proceeded to give the jury the following *Allen* type charge, which resulted in a unanimous verdict within 30 minutes:

> Ladies and gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole or Suspension of Sentence.
>
> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgement.
>
> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

*Id.*, 484 U.S. at 234–35, 108 S.Ct. at 549, 98 L.Ed.2d at 575–76.

Characterizing the query from the trial court as asking how the jurors stood on the question of whether further deliberations might assist them in attaining a verdict, as opposed to an inquiry into the numerical division of the jury, the Court stated that this type of question was actually sanctioned by *Brasfield*. *See id.*, 484 U.S. at 240, 108 S.Ct. at 552, 98 L.Ed.2d at 579. Noting further that the Allen charge given did not instruct the jury that they had to reach a verdict, the Court ruled that the combination of the particular supplemental instruction given and the particular polling of the jury done were not coercive in such a way as to deny Lowenfield any constitutional rights. *See id.*, 484 U.S. at 241, 108 S.Ct. at 552, 98 L.Ed.2d at 579.

From *Lowenfield* we glean that, as far as the Supreme Court is concerned, while some combinations of supplemental instructions and jury polling might result in a violation of constitutional rights, this will not be the result when the overall effect of the combina-

---

5. As opposed to an appeal to the Court's supervisory powers over the lower federal courts. *See* *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957, 958 (1965).

tion is not such as to result in a coerced verdict. *See id.,* 484 U.S. at 241, 108 S.Ct. at 552, 98 L.Ed.2d at 579. Each case must be decided on its own facts. *See id.,* 484 U.S. at 241, 108 S.Ct. at 552, 98 L.Ed.2d at 579.

With this guidance in mind, we turn to the Texas state cases dealing with this issue. The death penalty case of *Howard v. State,* a case dealing with this subject matter, appears to be factually as well as legally on point, Hollie's assertions to the contrary notwithstanding. *See Howard,* 941 S.W.2d at 121–24. The relevant facts in *Howard* show that the jury heard nineteen days of testimony from 157 witnesses and saw over 300 exhibits. *See id.,* at 121. After the close of the punishment phase of the trial, the jury deliberated approximately eight hours before sending a note to the trial court indicating that they were deadlocked 10–2 in favor of a "yes" answer to special issue number one. *See id.* After an overnight recess the jury resumed deliberations and after approximately nine hours they sent a note to the trial court indicating that they were deadlocked 10–2 in favor of a "no" answer to special issue number two. *See id.* at 122. After another overnight recess the jury resumed deliberations for approximately ten hours and nine hours over the next two days, sending the trial court a note after two hours on what was now the fifth day of deliberations saying they were hopelessly deadlocked with the same vote on special issue number two. *See id.* At this point the trial judge gave a modified *Allen* charge, as follows:

Ladies and gentlemen of the jury: You have heard several weeks of testimony in this cause and a considerable amount of time and effort has been expended in bringing this evidence before you. Careful consideration of all of such evidence might take quite a bit of your time. When you arrive in the jury room it is your duty to consult with one another, to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to individual judgement. Each of you must decide the case for yourself but only after discussion and impartial consideration of the evidence with your fellow jurors. Do not hesitate to re-examine your own views

and to change your opinion if you are wrong, but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

With these additional instructions you are requested to deliberate in an effort to arrive at a verdict that is acceptable to all members of the jury if you can do so without doing violence to your conscience. Do not violate your conscience but continue to deliberate.

*Id.* at 123–24. The jury continued deliberations for six more hours, recessed, and returned the next day, arriving at a unanimous verdict at 9:50 a.m. *See id.* at 124.

In finding the *Allen* charge to be noncoercive in this context, the Court of Criminal Appeals stoutly defended the philosophy behind *Allen* charges. *See id.* at 123. The particular charge given was found to be proper and in conformity with the purpose of an *Allen* charge. *See id.* at 124. The fact that the trial court inadvertently found out exactly how the jury was deadlocked, but did not know exactly which individuals were the holdouts, was given important consideration:

We are mindful that in some contexts, a trial court might engender coercion by actively identifying jurors with minority view points and tacitly instructing them to re-examine their perspectives. However, in the case at bar, the trial court did not probe the jury or attempt to identify the minority jurors. The trial court's information as to numeric division was an unsolicited and extraneous reference in a note from the jury.

*See id.* at 124.

Thus, in a search for error of constitutional dimension, the fact that a trial court does not search out and publicly target, specifically or inferentially, specific members of the jury and by a supplemental *Allen* charge urge *them* to re-evaluate *their* views, is very important vis-a-vis coercion of a verdict. *See Howard,* 941 S.W.2d at 123. Much the same sentiment has been voiced by the Texas Supreme Court:

Any supplemental charge, such as the original Allen charge, which is addressed specifically to the minority jurors of a deadlocked panel is expressly and inherently coercive.

Stevens v. Travelers Ins. Co., 563 S.W.2d 223, 228 (Tex.1978). Still, each case must be decided on its own facts. See Lowenfield, 484 U.S. at 241, 108 S.Ct. at 552, 98 L.Ed.2d at 579.

Summarizing the case at bar, the facts show that the trial judge presided over two days of testimony and part of a day of argument to the jury. The jury deliberated for four hours during the rest of that third day and then informed the court that it was deadlocked 11-1. The trial court sent jurors home, presumably where they could "sleep on it", and gave them a modified Allen charge the next morning with instructions to report on their progress in about an hour. The jury returned a verdict before that report was due.

█ The record is clear that the judge was inadvertently given the numerical split, and further that he never sought to publicly identify who the holdout was. The modified Allen charge given, and set out above, conforms in all meaningful respects with the charges approved in Lowenfield, Allen and Howard. See Lowenfield, 484 U.S. at 234-35, 108 S.Ct. at 549, 98 L.Ed.2d at 575-76; Allen, 164 U.S. at 501-02, 17 S.Ct. at 157-58, 41 L.Ed. at 531-32; Howard, 941 S.W.2d at 123-24.

Further, this court has approved an identically worded Allen charge as non-coercive. See Ray v. State, 649 S.W.2d 142, 147 (Tex. App.—Fort Worth 1983, pet. ref'd).[6]

In fact, the charge given in this case omitted the wording in the original Allen charge that urged those jurors in the minority to reconsider their view solely because those in the majority, who are presumably just as qualified to decide the issue, hold the opposite view.[7] Such a "watered down" Allen charge is even less potentially coercive. See Lowenfield, 484 U.S. at 237-38, 108 S.Ct. at 551, 98 L.Ed.2d at 577-78; Howard, 941 S.W.2d at 123. Additionally, the Court of Criminal Appeals has held that an almost identical charge given under similar circumstances, including the fact that the trial judge knew the numerical split of the jury and even knew that the foreman was one of the minority members, was neither coercive in nature nor a comment on the weight of the evidence. See Arrevalo v. State, 489 S.W.2d 569, 571-72 (Tex.Crim.App.1973). Upon review of the factors previously discussed, we likewise find that in this case the trial judge neither commented on the weight of the evidence nor had, by written or spoken word or act, a coercive effect on the jury's deliberations. See Lowenfield, 484 U.S. at 234-35, 108 S.Ct. at 549, 98 L.Ed.2d at 575-76; Allen, 164 U.S. at 501-02, 17 S.Ct. at 157, 41 L.Ed. at 531-32; Howard, 941 S.W.2d at 123-24; Arrevalo, 489 S.W.2d at 571-72.

6. In Ray, the charge was worded as follows:

If this Jury finds itself unable to arrive at an unanimous verdict, it would be necessary for the Court to declare a mistrial and discharge the Jury.

The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another Jury at some future time. Any such future Jury will be impaneled in the same way this Jury has been impaneled, and will likely hear the same evidence which has been presented to this Jury.

The questions to be determined by that Jury will be the same questions confronting you and there is no reason to hope that the next Jury will find these questions any easier to decide than you have found them.

With this additional instruction, you are instructed to continue deliberations in an effort to arrive at a verdict that is acceptable to all members of the Jury, if you can do so without violation to your conscience.

Ray, 649 S.W.2d at 146-47.

7. Specifically:

If much the larger number of the panel are for a conviction, a dissenting juror should consider whether the doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with equal desire to arrive at the truth, and under the sanction of the same oath. And on the other hand, if the majority are for acquittal, the minority ought seriously to ask themselves whether they might not reasonably, and ought not to, doubt the conclusions of a judgement which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

Smith, 49 Conn. at 386.

Hollie also argues in his brief that the giving of a time limit of an hour after which the jury was to report their progress was an additional coercive factor. This court imposed deadline received considerably more emphasis in oral argument. Under Hollie's surmise, the trial judge was putting pressure on the lone holdout to help the jury render a quick verdict. We disagree.

The giving of a time limit to a jury is apparently a rare occurrence in our jurisprudence, judging from the lack of cases wherein such an action by the trial court has been reported. On first blush a time limit seems inherently coercive, almost like an ultimatum to reach a verdict "or else." But the "or else," if it meant a mistrial and discharge of the jury, might have just the opposite effect. Jurors in the minority might view a deadline and discharge afterwards as "the light at the end of the tunnel" so to speak. Knowing that their ordeal was about to end, they might cease meaningful dialogue about re-evaluating their position. Then again, they might view a deadline as pressure to give in, whether they had time to consider the matter to their satisfaction or not. Either of these two potential effects of a court imposed deadline thwart the very purpose of jury deliberations, which are to be coercion free and also free from "every consideration other than that of the evidence and the law as expounded in a proper charge." *Brasfield,* 272 U.S. at 450, 47 S.Ct. at 136, 71 L.Ed. at 346.

■ From the tenor of the trial court's sympathetic remarks to the jurors during the time they were deadlocked, we believe in the instant case that it was trying to be considerate, rather than coercive, in asking for a report in an hour. Jurors, often unused to being in such a "captive" environment and unhappy because of the attendant unpleasantness of argumentative conflict, would naturally feel relief if some of the mystery of the time limits of their captivity were removed. By all indications here the trial judge was closely monitoring their progress and possibly giving them a "hint of daybreak" meant to salve their perceived anxiety over the situation. However, as set out above, such laudatory motives can easily have an ancillary effect on deliberations that is inapposite to the purpose for deliberations. It is good to remember that when a jury is at an impasse in their deliberations, it is the judiciary's duty to "coerce" them into further deliberation and debate so that the jury might fulfill their statutory duty to render a verdict and avoid a mistrial. *See Howard,* 941 S.W.2d at 125.

When a trial judge feels the need to address the uncertainty in the jury's collective mind about the duration of their deliberations, it would perhaps be best to give only jury instructions that have been previously sanctioned by the Court of Criminal Appeals. *See Arrevalo,* 489 S.W.2d at 572. When the jury in *Arrevalo* sent out a note inquiring how long they would deliberate, the trial judge responded:

There is no set time. This is a matter that is within the discretion of the court. The length of time that you should be required to deliberate is again within the discretion of the court. At this time I do not feel that you have deliberated a sufficient length of time to fully eliminate the possibility of you being unable to arrive at a verdict, so I will ask you to continue to deliberate.

*Arrevalo,* 489 S.W.2d at 572.

■ Because of the unpredictable and potentially undermining effects of deadlines given by a trial judge during a jury's deliberations, such action is highly discouraged and should be generally avoided. However, we do not find under the facts of this case that the deadline suggested to the jury was, either in itself or in combination with other factors, coercive. Having found that the Allen charge given was neither in itself nor in combination with other factors coercive, we overrule Hollie's sole point.

The judgments of the trial court are affirmed.