**Opinion filed March 20, 2014**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-12-00014-CR & 11-12-00015-CR

_____

## DAVID WAYNE BOSWELL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 220th District Court**
**Comanche County, Texas**
**Trial Court Cause Nos. CR-03371 & CR-03370**

## M E M O R A N D U M   O P I N I O N

David Wayne Boswell, Appellant, appeals his convictions for aggravated assault with a deadly weapon and for evading arrest. In Cause No. 11-12-00014-CR, the jury found Appellant guilty of the offense of aggravated assault with a deadly weapon, and upon Appellant's plea of true to the enhancement allegation,

the jury assessed punishment at confinement for eight years.[1]  In Cause No. 11-12-00015-CR, the jury found Appellant guilty of the offense of evading arrest with the use of a vehicle, a state jail felony, and it assessed punishment at confinement for one year.[2]  Appellant challenges both convictions in three points of error.  We affirm.

## I. *Evidence at Trial*

Although Appellant does not challenge the sufficiency of the evidence, we provide a summary of the evidence at trial to provide context in understanding Appellant's points of error and our analysis of them.

### A. *The Alleged Assault*

Appellant arrived at Randy and Kristy Burns's property in the afternoon to drop off the bed of a pickup.  Appellant's wife—Tiffany Boswell (Boswell)—and their children were already on the property when Appellant arrived.  Charles Fonville, whom Appellant had met once or twice before, and Mason Jade Warren, who is Boswell's first cousin, arrived in the evening.  The men spent the late afternoon and evening in Randy's shop, drinking alcohol, while the women spent most of their time inside the Burnses' home.  Some of those present testified that Fonville and Appellant had disagreements that created tension while they were in the shop and when everyone was inside the Burnses' home.  Kris and Kristin Scitern arrived later at the Burnses' property.

Around 10:00 p.m., Fonville and Warren left the property in Fonville's pickup, but they returned shortly.  Appellant testified that, when Fonville and Warren returned, Appellant and Boswell had gathered their children and were about to leave.  Appellant saw Kris Scitern approach Fonville's pickup and have a

---

[1]*See* TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011).

[2]*See* former TEX. PENAL CODE § 38.04(a), (b)(1)(B) (2009).

2

brief discussion with Fonville and Warren. Appellant knew that Warren did not like him because they had been in an altercation at a previous party.

After Kris backed away from the pickup, Appellant saw Warren get something from the back of Fonville's pickup. Appellant said that Fonville and Warren approached him and that Fonville said, "I'll bet you can't whip me and my little friend here." As they approached, Warren was holding a shovel, and Fonville was holding something in his left hand, although Appellant could not identify the item at the time. At that point, Fonville jabbed at Appellant, and the two of them struggled with each other to the ground.

Appellant grabbed at Fonville's wrist and was cut in the hand by the object Fonville was holding. As Appellant wrestled with Fonville to take control of the object that had cut him, Warren hit Appellant over the head with the shovel. The shovel blows caused multiple gashes in Appellant's head, and he bled profusely. Eventually, Appellant escaped, walked away from the altercation, told Boswell to call 911, got in his pickup, and drove away toward the hospital.

Boswell also testified on Appellant's behalf. Boswell said that she was present during the altercation between Fonville and Appellant and that, after Appellant yelled at her to call 911, she drove to get help because she could not get cell phone reception. Boswell found Billy Carson, a Gorman police officer, and told him that a fight was taking place. Officer Carson followed her back to the Burnses' property. By the time Boswell and Officer Carson arrived, Appellant had left the scene.

The remaining witnesses testified against Appellant. According to their version of the events, Fonville, while in the Burnses' shop, disapproved of Appellant's boasts about the towing capacity of Appellant's pickup. These witnesses claimed Boswell had left with her children and did not see the fight between Appellant, Fonville, and Warren. They also said that Fonville and Warren

left the Burnses' property to get ice but returned to the Burnses' property after they discovered the store was closed. Once Fonville and Warren had returned to the Burnses' property, Appellant and Fonville exchanged words, and Appellant approached Fonville with a knife in his hand. Appellant walked toward Fonville, and the two of them wrestled to the ground; almost immediately, the witnesses saw large pools of blood coming from beneath Fonville on the ground. Someone yelled that Appellant was killing Fonville, so Warren retrieved a shovel from the back of Fonville's pickup and hit Appellant several times in the head to break up the fight. Randy Burns testified that, during the scuffle, he stepped on Appellant's hand and took the knife away. Appellant then got off Fonville and fled the scene in his pickup while Fonville was on the ground bleeding from the stab wounds. Warren called 911, and Fonville was later taken in an ambulance to a hospital.

*B. Appellant's Encounter with Police*

Police Officer Chase Stiles of the De Leon Police Department, having heard a description of an alleged assailant's vehicle from a dispatch call, pursued Appellant as he drove past him in De Leon. Officer Stiles drove a clearly marked police car and wore a De Leon Police Department uniform when he turned on his lights in an attempt to stop Appellant's vehicle. Officer Stiles turned his siren on after he followed the vehicle for about a quarter of a mile. Appellant did not pull over.

When Appellant kept driving and increased his speed, Officer Stiles swerved to the left and changed different siren tones to give Appellant every opportunity to notice him and pull over. Appellant slowed down and turned into a residential neighborhood, and Officer Stiles pulled in front of him as he approached a stop sign. Appellant exited his vehicle, covered in blood, and approached the officer.

Officer Stiles had his gun drawn and told Appellant to get on the ground, but Appellant did not cooperate and continued to walk toward Officer Stiles. As

4

Appellant moved closer, he used coarse language and threatened Officer Stiles. Officer Stiles drew his Taser, and Appellant turned back toward his pickup. After Appellant told Officer Stiles that he "ha[d] something for [him]," Officer Stiles deployed the Taser, sending Appellant to the ground. Officer Stiles then handcuffed Appellant, called for backup, and requested an ambulance. Because Appellant continued to be uncooperative and was hostile toward the E.M.S. staff, Officer Stiles rode with Appellant in the ambulance to the hospital.

Appellant testified he was disoriented and could barely see after he left the Burnses' property, and he never heard sirens or saw police lights until Officer Stiles pulled in front of him on the residential street. Appellant said that he stopped when a bright light shone in his face and that he could not tell from whom or what the bright light was coming. Appellant exited his vehicle, identified himself, and asked for help. He did not know that the person stopping him was a police officer until after he had been tased and put on the ground.

Appellant was arrested and charged with one count of aggravated assault with a deadly weapon and one count of evading arrest. He agreed to consolidate the cases and proceed to trial on both charges.

*C. Appellant's Trial*

Jury selection for Appellant's trial began on Monday, November 14, 2011. The trial judge told the jury that he expected to conclude the trial by the end of the same week. Throughout Appellant's trial, the trial court repeatedly stressed the importance of these time restraints and the trial judge's intent to finish the trial by Friday. After hearing the evidence, the jury began deliberations at 3:19 p.m. on Friday, November 18, 2011. During the course of deliberations, the jury asked to review physical evidence, which the trial court granted in part. Later, the trial court denied the jury's request to review witness testimony. The jury later informed the trial court that it had reached a verdict on the evading arrest charge

5

but that it was deadlocked 10-2 on the aggravated assault charge. The trial court instructed the jury to continue deliberating and asked counsel, because it was early evening, if they thought the trial court should ask the jurors if they wanted a sandwich. The State said, "No," and defense counsel responded, "See what happens for a little bit."

Still later in the evening, Juror Tamera Lack, who was not the jury foreman, attempted to send a note to the trial court. The trial court denied the request. Later on, the jury sent a note to the trial court indicating that it was still deadlocked and that the two jurors who could not agree with the other ten said there was nothing that would change their minds. The State suggested that the trial court submit an Allen[3] charge to the jury, to which the defense objected as being too coercive. The trial court then submitted the following supplemental charge to the jury:

> If this jury finds itself unable to arrive at a unanimous verdict, it will be necessary for the court to declare a mistrial and discharge the jury. The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such future jury will be empanelled in the same way this jury has been empanelled and will likely hear the same evidence which has been presented to this jury. The questions to be determined by that jury will be the same questions confronting you, and there is no reason to hope the next jury will find these questions any easier to decide than you have found them.
>
> With this additional instruction, you are requested to continue deliberations in an effort to arrive at a verdict that is acceptable to all members of the jury, if you can do so without doing violence to your conscience. Don't do violence to your conscience, but continue deliberating.

Still later in the evening, the jury requested to view the police video of the Burnses' property, which was taken after police arrived on the scene. The trial

---

[3]*See Allen v. United States*, 164 U.S. 492 (1896).

court granted the request. Just before 10:00 p.m., the jury notified the trial court that it had reached a verdict on both offenses. Thereafter, the jury foreman read the jury's verdict of guilty as to each offense and confirmed each verdict was unanimous. The trial court accepted both verdicts and proceeded to the punishment phase of trial.

After the punishment phase was complete, Appellant moved for new trial on grounds that, because the unanimity of the verdict was at issue, he received ineffective assistance of counsel when defense counsel failed to poll the jury. At the hearing on Appellant's motion, Juror Lack testified that she did not agree with the verdict and that, if she had been asked if guilty was her verdict, she would have said "no" as to both offenses. According to Juror Lack, she did not speak up when the verdict was being read because she had never served on a jury and did not know she had the option to do so. Juror Lack further testified that, when the jury came into the courtroom to read the guilt/innocence verdict, she was upset and had tears falling down her face the whole time.

Defense counsel testified he elected not to have the jury polled because he did not believe the jury was divided and, given that the case was moving onto punishment in the first-degree felony range, he did not want to antagonize the foreman and the other jury members by polling them individually. Counsel thought at the time that the dissenting jurors had changed their votes based upon their review of the evidence that was requested after the jury notified the trial court for the second time that it was deadlocked. Although defense counsel admitted his failure to poll the jury may have been an error in judgment, he testified he had no indication that the verdict was not unanimous until after the trial was over. When the verdict was read, defense counsel looked into the jurors' faces and saw nothing to make him believe that the probability of achieving anything favorable to the

defense by polling the jury outweighed the possible damage to Appellant in the punishment phase.

## II. *Issues Presented*

Appellant brings three points of error on appeal. First, Appellant claims he was denied effective assistance of counsel when his trial counsel failed to poll the jury to ensure the unanimity of the verdict. Second, Appellant claims he was egregiously harmed by the trial court's submission of a "coercive" *Allen* charge during the guilt/innocence phase of trial. Finally, Appellant contends that the trial court abused its discretion when it denied his motion for new trial.

## III. *Analysis*

### A. *Ineffective Assistance of Counsel*

Appellant contends in his first point of error that he received ineffective assistance when his trial counsel failed to poll the jury. The standard of review for an ineffective-assistance-of-counsel claim is whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The *Strickland* standard is two-pronged: (1) a performance standard and (2) a prejudice standard. *Id.* at 687.

For the performance standard, we must determine whether counsel's representation fell below an objective standard of reasonableness. *Id.* There is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 689; *Walker v. State*, 406 S.W.3d 590, 594 (Tex. App.—Eastland 2013, pet. ref'd). To overcome this presumption, an allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). "[W]hen no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls

below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as [he] did." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

For the prejudice standard, we determine whether there is a reasonable probability that the outcome would have differed but for counsel's errors. *Strickland*, 466 U.S. at 686; *Andrews*, 159 S.W.3d at 102. The reasonable probability must rise to the level as to undermine confidence in the outcome of the trial. *Walker*, 406 S.W.3d at 594. Courts may dispose of a claim of ineffective assistance if an appellant fails to prove either prong of the *Strickland* test. *Cox v. State*, 389 S.W.3d 817, 819 (Tex. Crim. App. 2012) (citing *Strickland*, 466 U.S. at 687).

Appellant claims the unanimity of the verdict was clearly at issue because the jury sent out multiple notes asking to review inconsistencies in the evidence and twice notified the trial court it was deadlocked. Furthermore, Juror Lack requested to speak personally to the trial judge during the lengthy deliberations, and she was crying while the verdict was returned. According to Appellant, because the unanimity of the verdict was at issue, there was no conceivable reason for his trial counsel's failure to poll the jury.

While the Code of Criminal Procedure allows the jury to be polled, there is no requirement that trial counsel do so. TEX. CODE CRIM. PROC. ANN. art. 37.05 (West 2006). According to his testimony in the hearing on the motion for new trial, defense counsel considered the circumstances surrounding the verdict and elected not to poll the jury to benefit Appellant in the next phase of the trial. Defense counsel articulated his strategy of not offending jurors before the punishment phase by declining to poll them in light of their demeanor and the unanimous verdict. We cannot conclude that his strategic decision was unreasonable, and Appellant has failed to overcome the presumption that defense

9

counsel's conduct fell within the wide range of reasonable professional assistance. We overrule the first point of error.

### *B.* Allen *Charge*

Appellant contends in his second point of error that the *Allen* charge submitted to the jury by the trial court was "coercive." An *Allen* charge instructs a deadlocked jury to continue deliberating to reach a verdict if the jurors can conscientiously do so. *See Allen*, 164 U.S. at 501. This supplemental charge "reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve." *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006). Both the United States Supreme Court and the Court of Criminal Appeals have sanctioned the use of an *Allen* charge. *See Allen*, 164 U.S. at 501–02; *Howard v. State*, 941 S.W.2d 102, 123 (Tex. Crim. App. 1996). On appeal, the primary inquiry when considering the propriety of an *Allen* charge is its "coercive effect" on juror deliberation in its context and under all circumstances. *Howard*, 941 S.W.2d at 123 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988)); *Freeman v. State*, 115 S.W.3d 183, 186–87 (Tex. App.— Texarkana 2003, pet. ref'd).

The *Allen* charge in this case was not coercive. The charge made no indication of a preferred verdict and did not express the trial court's opinion of the case. It spoke to the jury as a whole rather than addressing a minority of the jurors and instructed the jury it should arrive at a verdict only if it could do so "without doing violence to your conscience." *See Freeman*, 115 S.W.3d at 187. The Court of Criminal Appeals and many of our sister courts have approved *Allen* charges containing nearly identical language. *See, e.g.*, *Arrevalo v. State*, 489 S.W.2d 569, 570–72 (Tex. Crim. App. 1973); *Draper v. State*, 335 S.W.3d 412, 417 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *West v. State*, 121 S.W.3d 95, 108–

09 (Tex. App.—Fort Worth 2003, pet. ref'd). The Fifth Circuit has also held that a similar *Allen* charge was not coercive. *See, e.g.*, *United States v. Kelly*, 783 F.2d 575, 576–77 (5th Cir. 1986); *United States v. Anderton*, 679 F.2d 1199, 1203 n.3 (5th Cir. 1982).

Nevertheless, Appellant argues he was egregiously harmed by the trial court's submission of the *Allen* charge, in its context, because the trial court repeatedly stressed the time constraints associated with the case and forced the jury to work unusually long hours. The fact that the trial court may have pressured the jury to reach a verdict within a particular period of time does not mean the jury was unduly coerced. *See Hollie v. State*, 967 S.W.2d 516, 524 (Tex. App.—Fort Worth 1998, pet. ref'd) (holding that supplemental *Allen* charge that imposed deadline on jury was not unduly coercive under the facts). Given that the charge in this case referred to the jury as a whole, warned the jurors against violating their consciences, and did not impose a deadline, we do not find under the facts that any temporal pressure communicated to the jury was, either in itself or in combination with other factors, coercive. Because we have found that the *Allen* charge in this case was not coercive under the circumstances, we overrule Appellant's second point of error.

### C. Motion for New Trial

Appellant contends in his final point of error that the trial court erred when it denied his motion for new trial. We review a trial court's ruling on a motion for new trial under an abuse of discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We must view the evidence in the light most favorable to the trial court's ruling and uphold that ruling if it was within the zone of reasonable disagreement. *Id.* A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the ruling of the trial court. *Id.*

Appellant argues a new trial was warranted because the evidence produced demonstrated that trial counsel's failure to poll the jury constituted ineffective assistance of counsel and contributed to Appellant's conviction and punishment. However, we have held that trial counsel's failure to poll the jury did not constitute ineffective assistance of counsel; we also hold that the trial court did not abuse its discretion when it denied Appellant's motion for new trial on the same grounds. We overrule Appellant's final point of error.

## IV. *This Court's Ruling*

We affirm the judgments of the trial court.

MIKE WILLSON

JUSTICE

March 20, 2014

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.