

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00488-CR

_____

DANITA CAROL THETFORD, Appellant

V.

THE STATE OF TEXAS

─────────────────────────────────────────────

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court No. 1558380R

─────────────────────────────────────────────

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Danita Carol Thetford appeals her convictions for attempted murder and injury to her son, C.T., allegedly due to Munchausen syndrome by proxy.[1] Thetford raises three points on appeal: (1) whether the trial court erred by denying her motion to quash her attempted-murder indictment for failure to state an offense; (2) whether Thetford's punishments for attempted murder and injury to a child violate the federal Double Jeopardy Clause; and (3) whether the trial court erred by instructing the jury with a coercive *Allen* charge. Because Thetford failed to preserve her complaint as to the indictment, because multiple punishments are authorized under express statutory language, and because the trial court's *Allen* charge was not coercive under the circumstances of this case, we will affirm the judgments of conviction.

## I. Background

It is undisputed that, during the first five years of his life, C.T. suffered from numerous medical conditions, including difficulty eating and constipation, due in part to his premature birth. But according to Thetford, these conditions lingered well beyond his fifth year, hindering his ability to properly eat, digest, and excrete food.

---

[1]Munchausen syndrome by proxy is also known as Pediatric Condition Falsification disorder and is a form of medical child abuse. *See, e.g., In re A.G.K.*, No. 04-16-00315-CV, 2016 WL 6775590, at *4 (Tex. App.—San Antonio Nov. 16, 2016, no pet.) (mem. op.) (recognizing Pediatric Condition Falsification disorder as another name for Munchausen syndrome by proxy).

In 2012, Thetford took then-10-year-old C.T. to Cook Children's Medical Center and reported that he was constipated, was retching and gagging after eating, and was not gaining weight. Over the next four years, doctors prescribed numerous medications for C.T. and performed multiple surgeries to address the gastrointestinal issues Thetford reported.

## A. Surgeries

Initially, the doctors at Cook Children's attempted to treat C.T.'s reported constipation with prescription medications. But in 2013, after Thetford claimed the drugs were not working, C.T. underwent an appendicostomy.[2] And in 2015, after Thetford continued to report that C.T. was painfully constipated, medical providers performed an ileostomy on C.T.[3] During this same time period, Thetford began reporting that C.T. refused to eat and again complained that he was retching and gagging after eating. Ultimately, these reports led C.T.'s doctors to place a gastrostomy button ("g-button") on C.T. to allow direct feedings into C.T.'s

---

[2]Dr. John Uffman—C.T.'s pediatric surgeon at Cook Children's—described an appendicostomy as "sew[ing the appendix] to the skin of the abdomen. The purpose of it is to give a flush in the large intestine to essentially help empty out the intestine much like you would give an enema from the rectum." An appendicostomy is also known as a cecostomy, ACE, or MACE.

[3]Dr. Uffman described C.T.'s ileostomy by stating, "we essentially brought the small intestine to the skin and bypassed the large intestine, essentially tak[ing] it out of the equation so the small intestine just empties to a bag instead of going through the large intestine."

stomach.[4]  C.T. gained approximately six pounds in his three-day stay in the hospital following placement of his g-button.  But after C.T. returned home, Thetford continued to report that her son could not tolerate food—even through the g-button—and that eating caused him pain.  Consequently, C.T.'s doctors placed "a special IV called a central line"—known as total parenteral nutrition ("TPN")[5]—to provide C.T. with intravenous sustenance.  But because Thetford still claimed C.T. was retching and that, despite the g-button and central line, feedings caused C.T. pain, his doctors recommended hospice care—not because C.T. was dying but so that C.T.'s insurance would pay for at-home assistance with his feedings.[6]

---

[4]The record indicates that the gastrostomy button placement procedure is also known as a "percutaneous endoscopic gastrostomy (PEG)" placement or "g-button" placement.  Dr. Uffman described a g-button as "a little tiny plastic tube that goes through the . . . skin and through the muscle directly into the stomach. . . .  So instead of feeding through the mouth, you're giving feeds directly into the stomach."

[5]C.T.'s health care providers described TPN to the jury as "a bag of fluid that has a hundred percent of the calories, protein, carbohydrates[,] and fat that you're supposed to take that would be in our normal diet. . . . broken down into its smallest components."  The nutrition goes "directly into the bloodstream," bypassing the intestines and digestive tract.  The nutrition is so concentrated that it can cause scarring if given through the peripheral veins in the arm, so it "requires a special IV called a central line" in "one of the subclavian veins or the jugular vein, one of the major veins in the neck."

[6]The State presented testimony that it is not uncommon for doctors to recommend hospice care for nonterminal pediatric patients to trigger insurance coverage for treatments.

4

## B. Hospice

In early March 2016, Angel Unaware began providing hospice care to C.T. At that time, C.T. was 13 years old but weighed only 51 pounds. While receiving help from Angel Unaware, Thetford continued to claim that the intravenous TPN and g-button feeds were making C.T. retch in pain, although Angel Unaware staff witnessed no retching and minimal pain. But since C.T. was a child and Angel Unaware staff did not live with him, they trusted Thetford's reports of C.T.'s condition.

Angel Unaware staff also noticed that Thetford shortened C.T.'s TPN feedings due to his alleged pain, and Thetford began requesting increases in the strengths and dosages of C.T.'s pain medications, claiming C.T. could not even walk, get a sponge bath, or be repositioned during his sleep—much less eat or digest food—without pain.

In April, C.T. was transferred to Angel Unaware's inpatient suite at the Ronald McDonald House. Thetford had discontinued C.T.'s TPN and g-button feedings prior to the transfer, and C.T. did not receive any such feedings while there. While C.T. was at the Ronald McDonald House, Thetford took steps to prevent C.T. from receiving solid food, claiming that she discouraged feeding C.T. because it caused him pain and would "prolon[g] the inevitable." Thetford requested a sign to be placed on C.T.'s door indicating that no food or drink should be brought into his room. She also asked Angel Unaware staff members to "give [C.T.] something that [would] make him go to sleep and not wake up." By this point, the Angel Unaware staff had grown

concerned that they had not witnessed the symptoms Thetford reported, noticing that C.T.'s alleged outcries of pain were consistently relayed through or prompted by Thetford, while C.T.'s vital signs and facial expressions rarely indicated pain. Because C.T. was due for hospice recertification, the Angel Unaware staff told Thetford that they needed to evaluate C.T.'s symptoms for several days without any family members present. According to Angel Unaware staff, during the evaluation period, C.T. asked for and "devoured" a variety of food—including a bean and cheese burrito—without retching or vomiting; he urinated without pain or alarming discharge; he slept and was repositioned during his sleep without incident; and he got out of bed and walked to the television. These actions contradicted Thetford's claims as to C.T.'s abilities, limitations, and conditions.

But Thetford, unhappy with the evaluation procedure, promptly removed C.T. from the Ronald McDonald House and took him back home with plans to procure hospice care from another provider.[7] Within a day, Child Protective Services removed C.T. from Thetford's care and took him to Cook Children's.

---

[7]Thetford scheduled an appointment with a new hospice provider—Vitas—and intended to switch C.T. to the new provider the day after she removed him from the Ronald McDonald House. But when Vitas contacted Cook Children's to obtain C.T.'s medical records on the morning of the appointment, the provider was informed that the physicians at Cook Children's no longer believed C.T. needed hospice care. Since Vitas could not provide hospice care without authorization from two physicians, Thetford called an ambulance to take C.T. to a different local hospital with the intention of seeking authorization for hospice care from different physicians.

6

## C. Post-Removal Improvement

Upon arrival at the hospital, C.T. was extremely malnourished and weighed only 53 pounds. Once admitted, he began eating large portions of food, experienced no abdominal issues, and gained 20 pounds in approximately two months. C.T.'s pediatric surgeon reversed his ileostomy, and his intestines immediately started working again.[8] C.T.'s central line and g-button were also removed, as he no longer required intravenous nutrition or direct feedings through his stomach, and C.T. gladly ate his food without needing pain medications.[9]

Ultimately, many of C.T.'s doctors, including his surgeon, concluded that the ileostomy and gastrostomy procedures had been unnecessary.

## D. Indictment

Thetford was indicted on five counts: (1) injury to a child by providing false information to medical professionals causing an unnecessary ileostomy; (2) injury to a child by providing false information to medical professionals causing an unnecessary gastrostomy; (3) injury to a child by failing to provide adequate food, adequate

---

[8]The jury heard testimony that the goal of an ileostomy is generally to "allo[w] the colon to rest, allow it to readapt," and "at some point reconnect [the intestine] back to the colon." The record thus indicated that an ileostomy reversal is not uncommon, though it generally occurs "about a year or two" after the initial procedure.

[9]The jury heard testimony that patients "shouldn't get TPNs forever," although they can rely on TPN long-term if needed. The record thus indicated that the discontinuation of TPN is not uncommon.

nutrition, or both; (4) attempted murder by failing to provide adequate food, adequate nutrition, or both; and (5) exploitation by using fabricated symptoms of C.T. as the basis for a charity fundraiser. Thetford filed a broad motion to quash her indictment, and the trial court held a hearing on the motion.

At the hearing, Thetford focused her arguments on counts one, two, and five of the indictment.[10] She made only a short argument regarding counts three and four, claiming that because the counts were "both specific intent offenses . . . alleged [] by omission," and because the State is not bound by the dates in the indictment, then "it's just so vague" and "need[s] more particularity." The trial court took the motion under advisement but tentatively denied the motion as to counts three and four.

Thetford was subsequently reindicted to clarify that the State charged Thetford with a failure to act when she had a duty to do so. As amended, count four charged Thetford with attempted murder by failing to provide adequate food, adequate nutrition, or both, "at a time when the defendant had assumed care, custody[,] or

---

[10]Regarding counts one and two, Thetford argued that (1) the counts attempted to criminalize speech in violation of the First Amendment; (2) the counts failed to state offenses because the Texas Penal Code does not authorize speech as the basis for injury to a child; and (3) the counts failed to provide adequate notice to Thetford because they did not identify the particular false information she allegedly provided medical professionals. *See* U.S. Const. amend. I; Tex. Penal Code Ann. § 22.04(a)(1), (b). Thetford made similar arguments regarding count five, claiming that (1) count five failed to provide adequate notice because it did not sufficiently allege the particular symptoms fabricated; (2) if the State was not required to plead the particular symptoms fabricated, the statute was unconstitutionally vague or vague as applied; and (3) count five failed to state an offense because the Texas Penal Code does not authorize the criminalization of speech.

control of [C.T.] or had a legal duty to act because the defendant was the mother of [C.T.]."[11] *See* Tex. Penal Code Ann. § 6.01(c) (establishing the rule that an omission is generally not an offense unless a law provides that the omission is an offense or provides that the person has a duty to act). Thetford then re-urged her previously filed motion to quash "because all of the allegations that [she] made and the arguments that [she] made when [she] argued the motion to quash[] equally appl[ied] to this new indictment." The trial court denied the motion.

The State then waived count five and proceeded to trial on the remainder of the indictment.

### E. Trial and Deliberations

The guilt–innocence phase of Thetford's trial took nearly three weeks.[12] The jury began deliberating at approximately 4:00 p.m. on Monday, October 15, 2018. By the time the court recessed for the day at 6:30 p.m., the jury had already sent the trial court five notes requesting copies of the evidence and other documents referenced during the attorneys' closing arguments. On the following day, the jury deliberated

---

[11]Thetford's new indictment also changed the dates "on or about" which counts two through five were alleged to have occurred and corrected the misspelling of "gastrostomy" in count two.

[12]Voir dire occurred on Monday, September 24, 2018. The trial on the merits began on Tuesday, September 25, and the parties closed nearly three weeks later on Monday, October 15.

9

for more than five hours[13] and sent two notes requesting specific exhibits as well as a list of exhibits. Just after 5:00 p.m. that day, the jury indicated it was "unable to come to unanimous [sic] decision on any of the four (4) counts" and "request[ed] to be on recess until to [sic] tomorrow." The trial court obliged.

Deliberations continued Wednesday morning. However, within 30 minutes, the jury sent a note stating, "We are unable to come to a decision on any of ther [sic] 4 counts. We have had discussion [sic] and it is clear that further deliberation won't matter." The trial court considered issuing an *Allen* charge but ultimately decided that such a charge would be premature because "the trial took three full weeks" and the jury had been deliberating "less than seven hours."[14] The court instead instructed the jury to continue its deliberations. The jury did so, deliberating all afternoon and sending two additional notes with questions regarding disputed testimony and the "on or about" language of the indictment. At approximately 5:20 p.m., the jury sent a note stating it "ha[d] come to an agreement on count #1" but "w[ould] not be able to come to an agreement on counts #2, 3[,] & 4 today." The jury asked to "recess until tomorrow," and again the trial court obliged.

---

[13]The record is unclear as to whether the jury recessed or continued deliberating while the trial court reviewed and crafted responses to the jury's notes. Such uncertainty accounts for approximately 45 minutes over the course of the jury's multi-day deliberations on the guilt–innocence phase.

[14]In its discussion of the jury note, the trial court stated that the jury had deliberated "less than seven hours." However, the reporter's record indicates that the jury had deliberated more than seven and a half hours.

After another four hours of deliberating on Thursday—with only one jury note requesting information regarding punishment—the jury sent out a note stating, "We have come to an agreement on counts #1–3; however, we are not able (nor does it appear) [sic] to agree on count #4. All jurors are holding strong to their positions." The court again considered issuing an *Allen* charge, and the State urged the court to pattern its charge after that used in *Johnson v. State*.[15] Thetford vehemently objected to the language of the draft charge as "draconian" and "oppressive . . . judicial bullying," arguing that it violated the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, as well as Article I, Sections 10 and 19 of the Texas Constitution. *See* U.S. Const. amends. V, VI, XIV; Tex. Const. art. I, §§ 10, 19. After considering Thetford's proposed alternatives—including two alternative *Allen* charges—the court instead offered to bring the jury in and ask the foreman if additional time and instructions would aid the jury in reaching a decision on count four. The court proposed that, if the presiding juror responded in the negative, the court would receive the jury's verdicts on counts one, two, and three, and declare a mistrial on count four. Both parties agreed to this approach.

When the jury was brought back into the courtroom, the presiding juror verbally confirmed that the unanimous verdicts on counts one through three had

---

[15]The same trial judge issued the *Allen* charge that was upheld in *Johnson v. State. See Johnson v. State,* No. 02-11-00516-CR, 2013 WL 43990, at *1–2 (Tex. App.—Fort Worth Jan. 4, 2013, no pet.) (mem. op., not designated for publication).

11

already been recorded on the verdict forms. The court then inquired of the presiding

juror whether further instruction and deliberation might be fruitful as to count four:

> THE COURT: All right. Now, with regard to Count Four, you have not been able to reach a decision; is that correct?
>
> THE FOREPERSON: That is correct.
>
> THE COURT: Now, if I were to -- able to send you back with additional time and further instruction, do you believe that you would be able to reach a unanimous verdict as to Count Four?
>
> THE FOREPERSON: With further instruction, depending on what that is, yes. Well, with further instruction, yes. I'll say that.
>
> THE COURT: All right. Now, how about additional time?
>
> THE FOREPERSON: Yes.
>
> THE COURT: All right. [Foreman], based upon what you've told me, I'm going to send you back, and I will be consulting with the lawyers.

After this exchange, the court tailored the *Allen* charge language used in *Johnson* to

apply only to count four, overruled Thetford's objections, and issued the charge to the

jury in open court.

At approximately 4:00 p.m., after receiving the *Allen* charge, the jury continued

deliberating. But just over an hour later, at approximately 5:15 p.m., the jury sent a

note indicating that it "still ha[d] not come to one decision" and requesting to "recess

for the day." Once again, the trial court obliged.

The following morning, a note from the jury reaffirmed that it was "still

deliberating on count #4 and ha[d not] come to a decision" and reminded the trial

12

court that the jury would need to break early to accommodate a juror's scheduling conflict that evening. The trial court reassured the jury that it would break in time to accommodate the scheduling conflict.

Around 3:15 p.m. on October 19, after nearly 24 total hours of deliberation[16]—approximately five and a half hours of which occurred after the *Allen* charge—the jury returned with a verdict on all counts: not guilty on counts one and two, and guilty on counts three and four.

The parties then proceeded to the punishment phase of the trial, presenting two days of punishment evidence. During the course of approximately fifteen and a half hours[17] of deliberations that followed, the jury sent the trial court seven jury notes, including three notes indicating that it had not come to an agreement or was having trouble reaching an agreement. Two of the three notes indicating disagreement asked to recess for the day, and the trial court granted those requests as it had in the guilt–innocence phase. In response to the sole note that indicated disagreement among the jury without requesting a recess, the trial court instructed the jury to "[p]lease continue your deliberation[s]."

---

[16]As explained in note 13, *supra*, this is an estimate. If the jury continued deliberating while the trial court reviewed its notes, then the duration of deliberations was approximately 45 minutes longer.

[17]Again, this is an estimate. If the jury continued deliberating while the court reviewed its notes, then the duration of punishment deliberations was approximately 20 minutes longer.

Finally, around noon on October 26, the jury reached a unanimous decision and assessed punishment at five years' confinement for injury to a child and ten years' confinement for attempted murder with a recommendation that the sentence for attempted murder be suspended and Thetford placed on community supervision. The trial court entered judgment in accordance with the verdict.[18]

## II. Discussion

Thetford argues three points on appeal: (1) that the trial court erred by denying her motion to quash the attempted-murder count of her indictment; (2) that her punishments for attempted murder and injury to a child penalized her twice for the same conduct in violation of the federal Double Jeopardy Clause; and (3) that the trial court erred by instructing the jury with a coercive *Allen* charge.

## A. Indictment

In her first point, Thetford claims the trial court erred by refusing to quash the attempted-murder count in her indictment for failure to state an offense. She argues that the statutory definition of criminal attempt requires an affirmative act, while the indictment alleged only an omission. Thetford further claims—without argument or explanation—that the defect in her indictment deprived the trial court of jurisdiction. Because jurisdiction is a threshold matter, we examine this issue first. *See State v.*

---

[18]The jury also provided a list of recommendations regarding the conditions of Thetford's community supervision. The trial court did not implement the jury's recommendations.

*Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009) (reiterating that "[t]rial court jurisdiction over a case is an absolute systemic requirement" and that a party may "rais[e] a jurisdictional complaint for the first time on appeal").

### 1. Jurisdiction

"The presentment of a valid indictment vests the district court with jurisdiction of the cause." *Jenkins v. State*, 592 S.W.3d 894, 898 (Tex. Crim. App. 2018); *see also* Tex. Const. art. V, § 12(b). Even if an indictment has a substantive defect, it is sufficient to confer personal and subject-matter jurisdiction under the Texas Constitution if it (1) "charge[s] a person" and (2) "charge[s] the commission of an offense."[19] *Jenkins*, 592 S.W.3d at 898. The indictment must be "clear enough to give an appellant adequate notice" and to enable the trial court, appellate court, and defendant to "identify what penal-code provision is alleged and whether that penal-code provision is one that vests jurisdiction in the trial court." *Jenkins*, 592 S.W.3d at 899–901 (internal quotation marks omitted); *Kirkpatrick v. State*, 279 S.W.3d 324, 328 (Tex. Crim. App. 2009).

---

[19]"Unlike in civil cases where personal jurisdiction over a party may be had merely by that party's appearance before the court . . . criminal jurisdiction over the person cannot be conferred upon the district court solely by the accused's appearance, but requires the due return of a felony indictment, or the accused's personal affirmative waiver thereof and the return of a valid felony information upon complaint." *Garcia v. Dial*, 596 S.W.2d 524, 527 (Tex. Crim. App. [Panel Op.] 1980). Subject-matter jurisdiction, in turn, "requires both a general grant of authority to the trial court *and* a charging instrument that invokes that jurisdiction over the particular case." *Trejo v. State*, 280 S.W.3d 258, 260 (Tex. Crim. App. 2009).

15

Here, Thetford does not dispute that the indictment "charge[d] a person." *See Jenkins*, 592 S.W.3d at 898. Indeed, the indictment listed Thetford's full name, race, age, gender, county identification number, and date of birth at the top of the document; it bore the title "The State of Texas vs. Danita Carol Thetford"; and it alleged "that Danita Carol Thetford, hereinafter called defendant" committed each of the charged offenses. *See id.* at 902 (holding that identification of defendant in the caption by name, address, and unique identification number was sufficient for purposes of personal jurisdiction). Thetford alleges however that the indictment failed to adequately "charge the commission of an offense." *Id.* at 898.

But Thetford confuses indictment defects with jurisdictional requirements. Assuming arguendo that the manner and means alleged in count four of Thetford's indictment—namely, "failing to provide adequate food and/or nutrition"—could not support her attempted-murder charge, such a defect would not render the indictment constitutionally insufficient or deprive the trial court of subject-matter jurisdiction. *See Rodriguez v. State*, 408 S.W.3d 628, 631 (Tex. App.—Austin 2013) (holding that error in Rodriguez's indictment—which alleged omissions rather than affirmative acts to support felony-murder charge—was an indictment defect subject to forfeiture), *rev'd on other grounds,* 454 S.W.3d 503 (Tex. Crim. App. 2014). Rather, the relevant jurisdictional question is whether the indictment is clear enough to identify the offense alleged. *Jenkins*, 592 S.W.3d at 901; *Kirkpatrick*, 279 S.W.3d at 328–29; *Rodriguez*, 408 S.W.3d at 631.

16

Thetford does not claim that she was unable to determine what offense the State intended to charge in count four. Count four tracked the language of the criminal-attempt and murder statutes, alleging:

> [T]he Defendant . . . *with the specific intent to commit the offense* of murder, did then and there attempt to *cause the death* of [C.T.] by failing to provide adequate food and/or nutrition, and said act did *amount to more than mere preparation that tends but fails to effect the commission of the offense intended.* [Emphasis added.]

*See* Tex. Penal Code Ann. § 15.01(a) ("A person commits an offense if, *with specific intent to commit an offense*, he does *an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended.*" (emphasis added)), § 19.02(b)(1) ("A person commits an offense if he: . . . intentionally or knowingly *causes the death of* an individual[.]" (emphasis added)). Count four expressly stated that Thetford had "attempted" the offense of "murder."

Since attempted-murder is a second-degree felony, the indictment was filed and Thetford's case was tried in the 432nd District Court—a district court statutorily vested with "original jurisdiction in criminal cases of the grade of felony."[20] Tex. Code Crim. Proc. Ann. art. 4.05; *see also* Tex. Gov't Code Ann. § 24.576 (establishing 432nd District Court and directing the court to "give preference to criminal matters"); Tex. Penal Code Ann. § 15.01(d) (categorizing criminal attempt as "one category lower than the offense attempted"), § 19.02(c) (categorizing murder as "a felony of

---

[20]Although Thetford was reindicted, both indictments in the record were filed in the 432nd District Court.

17

the first degree"). The indictment thus identified the person charged (Thetford) and the offense alleged (attempted murder) and was tried in a court with jurisdiction over the relevant grade of offenses (the 432nd District Court). *See Jenkins*, 592 S.W.3d at 899–902.

Thetford cannot plausibly claim otherwise. Apart from Thetford's conclusory allegation that the indictment failed to confer jurisdiction, she does not claim that she lacked notice of the person or of the Penal-Code provision charged. Defective or not, the indictment was constitutionally sufficient to confer jurisdiction on the trial court. We thus overrule this subpoint and turn to Thetford's primary argument that her indictment was defective.

### 2. Indictment Defect

Thetford claims that count four of her indictment—alleging attempted murder "by failing to provide adequate food and/or nutrition"—failed to state an offense because Texas does not criminalize attempt by omission. Specifically, Thetford argues that Texas statutes distinguish between "acts" and "omissions," and that the Texas statute defining criminal attempt requires an "*act* amounting to more than mere preparation" while Thetford's indictment alleged an omission—i.e., the "failure to act." Tex. Penal Code Ann. § 1.07(a)(1) (defining "act" as "a bodily movement"), § 1.07(a)(34) (defining "omission" as "failure to act"), § 15.01(a) (emphasis added) (defining attempt). *Compare* Tex. Penal Code Ann. § 15.01(a) (defining attempt and requiring "an act"), *with* Model Penal Code § 5.01(1) (defining attempt to include

18

either "do[ing] or omit[ing] to do" something). Thetford analogizes the act requirement in Texas's criminal-attempt statute to the act requirement in the felony-murder statute and urges us to follow *Rodriguez v. State* and hold that the trial court should have granted her motion to quash because a crime of omission cannot constitute an act for purposes of criminal attempt.[21] 454 S.W.3d 503, 507–08 (Tex. Crim. App. 2014), *modified on other grounds on reh'g* (Feb. 25, 2015). But *Rodriguez* is inapplicable in this context. The holding in *Rodriguez* turned on whether the evidence was sufficient to support the conviction. *See id.* Here, Thetford challenges the trial court's denial of her motion to quash her indictment for failure to state an offense.[22] Thus, *Rodriguez* is not controlling.

---

[21]In *Rodriguez*, the Court of Criminal Appeals held the evidence was insufficient to support Rodriguez's felony-murder conviction because her starvation of her son was a crime of omission and did not constitute an "*act* clearly dangerous to human life" as required for felony murder. *Rodriguez v. State*, 454 S.W.3d 503, 507–08 (Tex. Crim. App. 2014), *modified on other grounds on reh'g* (Feb. 25, 2015). Specifically, Rodriguez was indicted and convicted for murdering her infant son by (1) starving the infant and (2) withholding sufficient nutrition and fluids to maintain the infant's life. *Id.* at 505. The Court of Criminal Appeals noted that there was no evidence Rodriguez committed affirmative acts dangerous to human life and rejected the lower court's conclusion that the jury could have reasonably inferred that such acts were committed in the course of Rodriguez's starvation of her son. *Id.* at 507–08. Because "an 'omission' is a 'failure to act,'" the Court of Criminal Appeals condemned the lower court's reasoning as "gut[ting] the statutory distinction between 'acts' and 'omissions'" by "allow[ing] acts to be 'reasonably inferred' where practically any omission has occurred." *Id.* at 508.

[22]Rodriguez initially raised her challenge to the act requirement as an unpreserved attack on her indictment as well. *Rodriguez*, 454 S.W.3d. at 506; *see also Rodriguez*, 408 S.W.3d at 630–31. The sufficiency issue—on which the Court of Criminal Appeals ultimately reversed the case—was raised by the court of appeals as

19

### a. Preservation Requirements

We now turn to the question of whether Thetford preserved her complaint that the trial court erred by denying her motion to quash.

Challenges to the form or substance of an indictment are subject to forfeiture. *See* Tex. Code Crim. Proc. Ann. art. 1.14(b); Tex. R. App. P. 33.1(a); *Miller v. State,* 333 S.W.3d 352, 356 (Tex. App.—Fort Worth 2010, pet. ref'd) (per curiam) (op. on reh'g) ("Except for complaints involving systemic (or absolute) requirements, or rights that are waivable only, which are not involved here, all other complaints, whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)."). To avoid forfeiture, an error in the indictment must be challenged in writing and brought to the trial court's attention in a timely and specific manner. Tex. Code Crim. Proc. Ann. arts. 1.14(b), 27.10 ("All motions to set aside an indictment or information and all special pleas and exceptions shall be in writing."); Tex. R. App. P. 33.1(a); *Sanchez v. State*, 120 S.W.3d 359, 367 (Tex. Crim. App. 2003). "The simple filing of a motion"—though necessary to comply with the Code of Criminal

unassigned error and addressed by the parties in supplemental briefing. *Rodriguez*, 454 S.W.3d at 506; *Rodriguez*, 408 S.W.3d at 631. Such briefing may be authorized upon a party's motion or requested by the appellate court "whenever justice requires." Tex. R. App. P. 38.7; *see also Bigon v. State*, 252 S.W.3d 360, 369 (Tex. Crim. App. 2008). But Thetford's reliance on *Rodriguez* indicates that she was aware of her ability to raise her complaint as a sufficiency challenge and chose not to do so. Indeed, the State's appellate brief even pointed out that *Rodriguez* was a sufficiency case and noted Thetford's "[i]nterestin[g]" choice not to raise the issue on appeal. Given Thetford's decision not to file a reply brief or to request leave to file additional briefing on the issue, we decline to review the issue as unassigned error.

Procedure—"is not sufficient to bring [an indictment challenge] to the trial court's attention." *Garcia v. State*, 32 S.W.3d 328, 331 (Tex. App.—San Antonio 2000, no pet.) (holding defendant's written motion to quash failed to preserve his challenges to the indictment where motion was not brought to the trial court's attention until after trial); *see also Perry v. State*, No. 02-13-00054-CR, 2014 WL 70107, at *2–3 (Tex. App.— Fort Worth Jan. 9, 2014, pet. ref'd) (per curiam) (mem. op., not designated for publication) (discussing *Garcia* and holding appellant forfeited his complaint regarding trial court's alleged denial of his motion to quash where he "merely filed a motion to quash the indictment, did not bring the motion to the trial court's attention, did not obtain an express or implied ruling on it, and expressly informed the trial court that no pretrial matters needed a resolution").

It is also insufficient for the defendant to lodge a vague or indefinite complaint that the indictment "does not adequately and fairly inform the [d]efendant of the offense" or "does not set forth an offense with sufficient particularity." *See Zimmerman v. State,* 750 S.W.2d 194, 211–12 (Tex. Crim. App. 1988). Though the defendant need not use "magic language," she must "stat[e] the grounds . . . with sufficient specificity to make the trial court aware of the complaint." Tex. R. App. P. 33.1(a)(1)(A); *State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013) ("Rather than focus on the presence of magic language, a court should examine the record to determine whether the trial court understood the basis of a defendant's request."); *Thomas v. State,* 723 S.W.2d 696, 700–01 (Tex. Crim. App. 1986).

### b. Written Motion to Quash

Thetford's written motion to quash her indictment was insufficient to preserve the error of which she now complains.

First, Thetford's written motion was marred by a repeated, substantive typographical error—the apparent result of copying and pasting generic text challenging each count. Consequently, although Thetford may have intended to address all five counts of the indictment in her motion to quash, the motion, as worded, lodged five identical objections to count one.[23] For example, the portion of Thetford's motion addressing count four provided,

> 4. Count Four of the indictment alleges that on or about May 1, 2016, the defendant failed to provide adequate food and/or nutrition to [C.T.] with the specific intent to murder him and that the failure to provide food and/or nutrition on or about that date amounted to more than mere preparation.
>
> a. Count One is defective in that it does not allege a criminal offense.
>
> b. Count One is defective in that it does not set forth the offense purportedly charged in plain and intelligible words.
>
> The defendant cannot properly prepare a defense without sufficient notice of the allegations against her, nor can the defendant plead jeopardy as to any subsequent prosecution for the same offense, as required by the 5th, 6th, and 14th amendments to the United States Constitution, Article One, sections 10 and 19 to the Texas Constitution,

---

[23]The portion of Thetford's motion that addressed count five included both the boilerplate count-one challenges described above as well as three separate objections specific to count five. But Thetford's objections to count five are irrelevant to her preservation of the count-four challenge raised on appeal.

and the related and applicable provisions of the Texas Code of Criminal Procedure, including articles 1.04, 1.05, 1.10, 21.03, 21.04, 21.05, 21.11, 21.12, and 21.13.

Thetford later attempted to orally amend her written motion to correct the obvious errors, and after Thetford clarified that she had intended her boilerplate challenges in subsections (a) and (b) to challenge each count of the indictment, the trial court permitted her oral modification.

Despite obtaining leave of court to do so, the law does not permit a defendant to use an oral motion to expand upon, raise a different ground from, or cure the inadequacies of a written motion to quash. *Prudhome v. State*, 989 S.W.2d 852, 853–55 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding "oral motion . . . expanding upon or raising a different ground from her written motion did not cure the inadequacies of her [written] motion to quash"); *McDonald v. State*, 692 S.W.2d 169, 174–75 (Tex. App.—Houston [1st Dist.] 1985, pet. ref'd) (rejecting generic written motion to quash as "inadequate" and holding that "an oral motion expanding upon or raising a different ground from the written motion will not cure the inadequacies of the written motion to quash"); s*ee also State v. York*, 31 S.W.3d 798, 803 (Tex. App.—Dallas 2000, pet. ref'd) (holding trial court erred to the extent it granted motion to quash indictment based on oral expansions of written motion to quash); *State v. Goldsberry*, 14 S.W.3d 770, 775 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (holding, where appellant orally argued new grounds to quash the indictment in hearing on written motion to quash, that "[i]f the trial court quashed the indictment

23

based on the appellee's oral motion, it was error to do so"). Rather, the Texas Code of Criminal Procedure expressly requires indictment challenges to be "in writing." Tex. Code Crim. Proc. Ann. art. 27.10. Thus, despite the trial court's willingness to allow her correction, Article 27.10 required Thetford—at some point in time—to modify her motion in writing. *Id.*; *cf. Rosseau*, 396 S.W.3d at 555–57 (focusing preservation analysis on whether trial court was aware of the substance of appellant's indictment challenge but holding that appellant preserved challenge only after concluding that the written motion—as well as appellant's oral argument—raised the issue).

Further, even assuming that Thetford could orally amend her motion, her vague allegation that the attempted-murder indictment "d[id] not allege a criminal offense" was insufficient to preserve her current complaint regarding the statutory distinction between acts and omissions. Indeed, the language in Thetford's motion is reminiscent of that rejected by the Court of Criminal Appeals in *Whalon v. State.* 725 S.W.2d 181, 191 (Tex. Crim. App. 1986).

In *Whalon*, the defendant filed a motion to quash his indictment for felony theft. *Id.* at 191. The motion lodged generic objections:

> The indictment does not state facts sufficient to constitute an offense against the State of Texas.
>
> The indictment is vague and uncertain and fails to be or contain a plain, concise[,] and definite written statement of the essential facts constituting the offense sought to be charged.

24

> . . . .

> The indictment does not adequately and fairly inform the Defendant of the offense or offenses sought to be charged against him.

*Id.* Whalon then argued on appeal that the trial court erred by overruling his motion to quash because the indictment alleged appropriation of property but failed to specify the method of appropriation. *Id.* The Court of Criminal Appeals noted that Whalon's motion to quash was nearly identical to one previously considered by the Court in *Jones v. State*, where it held that such a "form motion [to quash] was a general allegation of inadequate notice, which *in itself* failed to adequately inform the trial judge of the manner in which notice was deficient." *Jones v. State*, 672 S.W.2d 798, 800 (Tex. Crim. App. 1984). Relying on *Jones*, the Court in *Whalon* held that the boilerplate challenges in the motion were "insufficient to apprise the trial court of the complaint which he now advances" and therefore insufficient to preserve Whalon's challenge to the indictment for appellate review. *Whalon*, 725 S.W.2d at 191.

Similarly, in *Prudhome v. State*, the defendant filed a generic motion to quash, claiming,

> The case, as indicted, fails to state a cause of action.

> . . . .

> Without the Defendant being made aware of the offense being set forth in plain and intelligible words, the information [sic] is fundamentally defective.

25

989 S.W.2d at 853. On appeal, Prudhome challenged his indictment for failure to allege a culpable mental state. *Id.* at 853–54. Citing *Jones,* our sister court held that Prudhome's "motion to quash was itself not adequate to inform the trial judge of the failure of the indictment to allege a culpable mental state." *Id.* at 855.

*Whalon* and *Prudhome* are but two of many cases recognizing the well-established rule that a generic, boilerplate complaint in a motion to quash is insufficiently specific to inform the trial court of an indictment defect, and thus is insufficiently specific to preserve the issue for appellate review. *Accord, e.g., Zimmerman,* 750 S.W.2d at 211–12 (holding that appellant could not challenge indictment on appeal for failure to identify the kidnapping victim where defendant filed boilerplate motion claiming the indictment was vague without mentioning the omission of the kidnapping victim's name, and appellant failed to bring the matter to the court's attention when it ruled on the motion); *Jones,* 672 S.W.2d at 799–800 (holding appellant's motion to quash— alleging that "the indictment is vague and uncertain" and "does not adequately and fairly inform the defendant of the offense or offenses sought to be charged"—was insufficient to preserve error); *Wright v. State,* 729 S.W.2d 123, 124–25 (Tex. App.— Beaumont 1987, pet. ref'd) (holding boilerplate paragraphs of motion to quash— alleging, among other things, that "[t]he indictment does not state sufficient facts to constitute an offense against the Laws of the State of Texas" and "[t]he indictment fails to allege all the essential acts or omissions by the Defendant necessary to

26

constitute the offense charged"—were insufficient to give the trial judge notice of defendant's complaint regarding typo in the indictment).

Following this well-established rule here, Thetford's generic allegation that her indictment "d[id] not allege a criminal offense" was insufficient to inform the trial court of her current complaint regarding the indictment's allegedly illegitimate charge of attempted murder by omission. Although Thetford was not required to use "magic language," she was nonetheless required to present her challenge in a manner that adequately enabled the trial court to understand and rule on her argument. *Cf. Rosseau*, 396 S.W.3d at 555–57 (holding motion to quash adequately presented facial constitutionality challenge where defendant did not use the phrase "facial constitutionality" but argued in written motion and at oral hearing that the statute "create[d] a 'class of individuals' who would potentially receive a greater punishment" and record indicated that the State and court understood and responded to defendant's facial constitutionality challenge). Because Thetford's written motion neither addressed the statutory distinction between an omission and an act nor included any other statements to give the trial court notice of her current complaint, Thetford forfeited this challenge. *See* Tex. Code Crim. Proc. Ann. art. 27.10; Tex. R. App. P. 33.1(a).

### c. Hearing on Motion to Quash

Moreover, Thetford failed to bring her alleged indictment defect to the trial court's attention at the oral hearing on her motion to quash. *See* Tex. Code Crim.

27

Proc. art. 28.01, § 1(4) (providing that a trial court may set a criminal case for a pretrial hearing on preliminary matters, including "[e]xceptions to the form or substance of the indictment or information").

Thetford said nothing about the issue she raises on appeal at the pretrial hearing on her motion. Rather, Thetford argued that the indictment "need[ed] more particularity on [counts] Three and Four" because "they're both specific intent offenses" and the allegations were "just so vague." Although both the State and Thetford's counsel repeatedly characterized count four of the indictment as attempted murder by omission, Thetford did not draw the court's attention to the statutory distinction between an omission and an act.[24] Indeed, she did not mention her claim that count four failed to state an offense at all. Where, as here, "an objection made in the trial court differs from the complaint made on appeal, a defendant has not preserved any error for review." *Thomas*, 723 S.W.2d at 700.

In sum, Thetford was required to file a written, specific motion to quash her attempted-murder indictment and to make the trial court aware of her complaint, but she did neither. We thus overrule Thetford's first point.

---

[24]Thetford raised her current argument—that criminal attempt requires an act rather than an omission—in her motion for a directed verdict and at the charge conference. However, by that point it was too late to preserve her argument as a challenge to the indictment. *See* Tex. Code Crim. Proc. Ann. art. 1.14(b) (requiring a defendant to object to an indictment defect "before the date on which the trial on the merits commences" to preserve the issue for review).

## B. Double Jeopardy

Thetford next argues that her convictions for attempted murder and injury to a child punished her twice for the same offense in violation of the federal Double Jeopardy Clause.[25] U.S. Const. amends. V, XIV.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a defendant from multiple punishments for the same offense. U.S. Const. amends. V, XIV; *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018); *Ex parte Benson*, 459 S.W.3d 67, 71 (Tex. Crim. App. 2015). To determine whether two offenses are the same for double jeopardy purposes, we apply

---

[25]Thetford does not raise a double jeopardy challenge under the Texas Constitution. Consequently, we limit our analysis to the federal Double Jeopardy Clause. *See Ex parte Lewis*, 219 S.W.3d 335, 338–71 (Tex. Crim. App. 2007) (thoroughly analyzing Texas's double jeopardy protection as distinct from federal double jeopardy protection, though ultimately adopting the federal *Kennedy* standard for double jeopardy challenges in mistrial settings); *Ex parte Hernandez*, 953 S.W.2d 275, 285–86 (Tex. Crim. App. 1997) (holding appellant waived state double jeopardy complaint by failing to separately brief the issue and that the court of appeals erred by assuming, without separate analysis, that the state and federal protections were the same because "the [United States] Supreme Court's interpretations of the Fifth Amendment do not govern the meaning of the Texas Constitution" (internal quotation marks omitted)); *Heitman v. State*, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991) ("Attorneys, when briefing constitutional questions, should carefully separate federal and state issues into separate grounds and provide substantive analysis or argument on each separate ground."); *Ex parte Necessary*, 333 S.W.3d 782, 787 n.1 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Because the state constitutional [double jeopardy] right has not been invoked in this case, it is unnecessary for us to address the protection afforded by the state constitution, including whether or how that protection differs from the rights provided by the United States Constitution.").

two tests: (1) the "elements" test set forth in *Blockburger* to determine if the Double Jeopardy Clause is at play, and (2) the "units" analysis to determine the legislature's intended unit of prosecution for the offenses at issue. *Stevenson v. State*, 499 S.W.3d 842, 850 (Tex. Crim. App. 2016); *Benson*, 459 S.W.3d at 71–74. The ultimate question is whether the legislature intended to allow multiple punishments, because even if two offenses have the same elements under the *Blockburger* test, the Double Jeopardy Clause is not violated if the legislature intended to authorize multiple punishments. *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S. Ct. 673, 679 (1983); *Littrell v. State*, 271 S.W.3d 273, 276 (Tex. Crim. App. 2008) ("Sameness in [the multiple-punishments] context is a matter of legislative intent."); *Villanueva v. State*, 227 S.W.3d 744, 747 (Tex. Crim. App. 2007) ("Application of *Blockburger* does not serve . . . to negate otherwise clearly expressed legislative intent."); *Langs v. State*, 183 S.W.3d 680, 688 (Tex. Crim. App. 2006).

Here, we need not conduct the *Blockburger* "elements" test because the legislative intent to allow multiple punishments is clear. *See Hunter*, 459 U.S. at 368–69, 103 S. Ct. at 679 ("Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end."); *Langs*, 183 S.W.3d at 685 & n.15 (same, quoting *Hunter* and reiterating that the Court applies the *Blockburger* elements analysis "as the first means of analyzing a

30

multiple-punishment double[ ]jeopardy claim *when the legislature's intent is not clearly expressed*" (emphasis added)).

The Penal Code provision criminalizing injury to a child provides that "[a] person who is subject to prosecution under both this section and another section of this code may be prosecuted under either *or both* sections." Tex. Penal Code Ann. § 22.04(h) (emphasis added). This statute has been cited by the Court of Criminal Appeals as an example of the legislature "plainly express[ing] its intention that an accused should suffer multiple punishments for the same offense." *Littrell*, 271 S.W.3d at 278. And when the legislature manifests such an intent, the Double Jeopardy Clause does not protect a defendant from multiple punishments. *See Hunter*, 459 U.S. at 366, 103 S. Ct. at 678 ("[T]he Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."). Thus, assuming without deciding that Thetford's convictions for injury to a child and attempted murder are the "same" under the "elements" test, she may nonetheless be punished for both without violating the Double Jeopardy Clause. *See Desormeaux v. State*, 362 S.W.3d 233, 236–37 (Tex. App.—Beaumont 2012, no pet.) ("Desormeaux's convictions and punishments for both capital murder and injury to a child in the same trial do not violate the Double Jeopardy Clause."); *Johnson v. State*, 208 S.W.3d 478, 511 (Tex. App.—Austin 2006, pet. ref'd) (overruling double jeopardy challenge to dual convictions for capital murder and injury to an elderly individual

31

because Section 22.04(h) "plainly authorizes multiple punishments when a defendant's conduct violates both section 22.04 and another penal code section").

We overrule Thetford's second point.

## C. *Allen* Charge

In her final point, Thetford claims the trial court erred by issuing an unduly coercive *Allen* charge over her objection thereby depriving her of her right to a fair and impartial jury.[26] *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10. We review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Kirk v. State*, 421 S.W.3d 772, 784 (Tex. App.—Fort Worth 2014, pet. ref'd) (quoting *Kirsch*).

An *Allen*[27] charge is a supplemental jury instruction that "reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve." *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006). The United States Supreme Court and the Texas Court of Criminal Appeals have both approved the use

---

[26]Because there is no "significant textual difference" between the right to an impartial jury guaranteed by the Sixth Amendment and that guaranteed by Article I, Section 10 of the Texas Constitution, we treat the federal and state constitutional protections the same for purposes of our *Allen* charge analysis. *Jacobs v. State*, 560 S.W.3d 205, 210 (Tex. Crim. App. 2018); *Uranga v. State*, 330 S.W.3d 301, 304 & n.5 (Tex. Crim. App. 2010); *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998).

[27]The *Allen* charge is named for the 1896 United States Supreme Court case approving its use. *See Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 157 (1896).

of *Allen* charges, but the latter has cautioned trial courts to carefully word and administer the *Allen* charge in a noncoercive manner. *See Allen*, 164 U.S. at 501, 17 S. Ct. at 157; *Barnett*, 189 S.W.3d at 277 n.13; *Howard v. State*, 941 S.W.2d 102, 123–25 (Tex. Crim. App. 1996), *overruled in part on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014), *and modified in part on other grounds by Simpson v. State*, 119 S.W.3d 262 (Tex. Crim. App. 2003). An *Allen* charge is unduly coercive if it pressures jurors into reaching a particular verdict or improperly conveys the trial court's opinion on the merits of the case. *West v. State*, 121 S.W.3d 95, 107–08 (Tex. App.—Fort Worth 2003, pet. ref'd). An *Allen* charge may be considered coercive in one of two ways: the language of an *Allen* charge may be coercive on its face or the charge may have a coercive effect "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S. Ct. 546, 550 (1988); *Barnett*, 189 S.W.3d at 277 n.13; *Calicult v. State*, 503 S.W.2d 574, 576 (Tex. Crim. App. 1974); *West*, 121 S.W.3d at 107–08. Use of an *Allen* charge will constitute reversible error only if it is so improper on its face as to render jury misconduct likely, or if jury misconduct is demonstrated to have occurred in fact due to the charge's coercive effect. *Calicult*, 503 S.W.2d at 576; *West*, 121 S.W.3d at 107.

Here, Thetford does not argue—as she did before the trial court—that the language of the *Allen* charge was coercive on its face. She has also acknowledged that the trial court's charge was substantially similar to the *Allen* charge approved by this

33

court in *Johnson*.[28]  *See Johnson v. State*, No. 02-11-00516-CR, 2013 WL 43990, at *2

(Tex. App.—Fort Worth Jan. 4, 2013, no pet.) (mem. op., not designated for

publication).

---

[28]Indeed, the record indicates that the trial court intentionally patterned its *Allen* charge after the charge used in *Johnson*, modifying it only to tailor the language to the single count on which the jury was deadlocked (changes to the *Johnson* charge are underlined below):

Members of the jury:

The following and additional instruction applies only to Count Four of the Indictment.

You are instructed that in a large proportion of cases, absolute certainty cannot be expected.  Although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of the other jurors, each juror should show a proper regard to the opinion of the other jurors.

You should listen, with a disposition to being convinced, to the arguments of the other jurors.  If a large number of jurors are for deciding the case one way, those in the minority should consider whether they are basing their opinion on speculation or guesswork, and not on the evidence in the case.  Those in the minority should keep in mind the impression the evidence has made on a majority of the jurors who are of equal honesty and intellect as the minority.

If this jury finds itself unable to arrive at a unanimous verdict as to Count Four, it will be necessary for the Court to declare a mistrial and discharge the jury as to Count Four only.  The Court will receive your verdicts in Counts One through Three and proceed accordingly.  The indictment will still be pending as to Count Four only, and it is reasonable to assume that the case will be tried again before another jury at some future time.  Any such future jury will be empaneled in the same way this jury has been empaneled and will likely hear the same evidence which has been presented to this jury.  The questions to be determined by that jury will be the same questions confronting you, and there is no

34

Instead, Thetford claims that the *Allen* charge had a coercive effect given its context and the circumstances in which it was administered. Although she does not explain how or why the circumstances allegedly coerced the verdict, Thetford points to the "relatively quic[k]" guilty verdict following the issuance of the *Allen* charge as evidence that it "served to coerce the lone holdout."[29]

Because Thetford does not argue that the charge language was facially improper, she cannot prevail on appeal unless the record shows that the context and circumstances under which the *Allen* charge was given demonstrate actual jury misconduct due to the charge's coercive effect. *See West*, 121 S.W.3d at 107; *Freeman v. State*, 115 S.W.3d 183, 187 (Tex. App.—Texarkana 2003, pet. ref'd) (reciting rule that

---

reason to hope the next jury will find these questions any easier to decide than you have found them.

 With this additional information, you are instructed to continue deliberations in an effort to arrive at a verdict <u>as to Count Four</u> that is acceptable to all members of the jury, if you can do so without doing violence to your conscience.

*See Johnson*, 2013 WL 43990, at *1–2.

[29]In a footnote, Thetford also points to a juror affidavit attached to Thetford's "Motion to Set and Hold an Evidentiary Hearing on Defendant's Supplemental Motion for New Trial" as evidence that the "lone holdout" felt pressured by the trial court's *Allen* charge. But because the motion and affidavit were both filed without leave of court more than 30 days after the date on which the trial court imposed or suspended Thetford's sentence, we cannot consider this affidavit. *See* Tex. R. App. P. 21.4 (providing that a motion for new trial must be filed no later than 30 days after the date the trial court imposes or suspends sentence and allowing amended motions without leave within that timeframe if the court has not yet overruled the motion).

35

"[i]f an *Allen* charge is not coercive on its face, an appellant has the burden to show that jury misconduct occurred in fact" and holding that there was no evidence of coercion); *Davis v. State*, 709 S.W.2d 288, 291 (Tex. App.—Corpus Christi 1986, pet. ref'd) (overruling challenge to *Allen* charge where language was noncoercive and appellant failed to show that jury misconduct occurred in fact); *see also O'Brien v. State*, No. 14-94-01218-CR, 1996 WL 711221, at *2 (Tex. App.—Houston [14th Dist.] Dec. 12, 1996, pet. ref'd) (not designated for publication) (holding that, although defective *Allen* charge had coercive potential due to trial court's failure to include cautionary instructions, any such error was harmless in the absence of a showing of coercion).

To determine whether the circumstances surrounding the giving of an *Allen* charge demonstrate actual jury coercion, courts have considered factors such as (1) the length of deliberations prior to the *Allen* charge; (2) the length of the trial; (3) the amount and complexity of the evidence involved; (4) the nature of the case; (5) whether the *Allen* charge was premature; (6) whether the jury was required to endure "marathon deliberations"; (7) the number of *Allen* charges given; (8) whether the *Allen* charge cautioned the jurors not to violate their consciences; (9) whether the trial court singled out or pressured the minority jurors; (10) the trial court's knowledge of or inquiry into the jury's numerical division; (11) the length of deliberations following the *Allen* charge; (12) the jury's notes and requests to review evidence after

36

the *Allen* charge; and (13) whether the jurors each affirmed the verdict upon polling.[30]

*See, e.g.*, *Martin v. State*, No. AP-76,317, 2012 WL 5358862, at *16–18 (Tex. Crim. App. Oct. 31, 2012) (not designated for publication) (discussing factors 1, 2, 3, 10, 12, and 13); *Mason v. State*, Nos. 07-19-00066-CR, 07-19-00067, 2020 WL 4355522, at *7 (Tex. App.—Amarillo July 29, 2020, no pet.) (mem. op., not designated for publication) (discussing factors 1, 4, 5, 6, 11, and 12); *Minze v. State,* No. 02-15-00352-CR, 2016 WL 4474352, at *3–5 (Tex. App.—Fort Worth Aug. 25, 2016, no pet.) (mem. op., not designated for publication) (discussing factors 1, 4, 10, 11, and 12); *Barnett v. State*, 161 S.W.3d 128, 133–34 (Tex. App.—Fort Worth 2005) (listing factors 3, 4, and 11, but focusing on factors 9 and 10), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006); *Roll v. State,* No. 13-98-462-CR, 2000 WL 34251143, at *4–5 (Tex. App.—Corpus Christi Aug. 31, 2000, no pet.) (not designated for publication) (listing and applying factors 7, 8, 9, 11, and 12).  Here, applying these factors provides no indication that the *Allen* charge had a coercive effect "in its context and under all the circumstances."  *See Lowenfield*, 484 U.S. at 237, 108 S. Ct. at 550.

First, the duration of the jury's deliberations prior to the *Allen* charge was consistent with the "sheer length of the trial and amount of evidence presented to the

---

[30]*Allen* charges are reviewed based on the totality of the circumstances; the list of factors enunciated above is not an exhaustive list of relevant considerations in this or any other case.  *See Jenkins v. U.S.*, 380 U.S. 445, 446, 85 S. Ct. 1059, 1060 (1965) (reviewing *Allen* charge "in its context and under all the circumstances of this case" to determine if charge was coercive); *Lowenfield*, 484 U.S. at 237, 108 S. Ct. at 550 (quoting *Jenkins*); *Howard*, 941 S.W.2d at 123 (quoting *Lowenfield* and *Jenkins*).

jury." *Howard*, 941 S.W.2d at 121–22 (holding trial court did not err by denying motion for mistrial when jury indicated deadlock after approximately eight hours of deliberation on 19-day capital murder case involving 157 witnesses and 305 exhibits, and that the court did not err by issuing an instruction to continue deliberations after another six hours); *see also Martin*, 2012 WL 5358862, at *18 (holding that trial court did not err by instructing jury to continue deliberating after approximately 3.5 hours of deliberation on an 11-day trial involving 43 witnesses and 122 exhibits). The *Allen* charge came after approximately three days (about 18 hours) of deliberation on a three-week trial. The evidence included complex medical testimony and more than 150 exhibits, many of which were dense medical records. As to the nature of the case, the jury was considering four serious felony charges that raised questions regarding the medical necessity of specific treatments and surgical procedures. Thus, the length of the deliberations here was commensurate with the task at hand, and it was well within the trial court's discretion to instruct the jury to continue deliberations. *See Katzenberger v. State*, 439 S.W.3d 566, 570–71 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (holding that trial court did not abuse its discretion by denying a motion for mistrial and issuing an *Allen* charge after ten and a half hours of deliberation on a seven-hour trial); *see also Montoya v. State*, 810 S.W.2d 160, 166 (Tex. Crim. App. 1989) (recognizing that the "[l]ength of time that the jury may be held for deliberation rests in the discretion of the trial judge"); *Odom v. State*, 682 S.W.2d 445, 450 (Tex. App.—

Fort Worth 1984, pet. ref'd) (reciting "well[-]settled" rule "that the length of time a jury deliberates is discretionary with the trial court").

Furthermore, the trial court was careful not to issue the *Allen* charge prematurely. When the jury initially indicated a deadlock on all counts, the trial court considered an *Allen* charge but instead issued a less-aggressive jury instruction that simply directed the jury to continue deliberating. *See Ex parte Perusquia*, 336 S.W.3d 270, 276 (Tex. App.—San Antonio 2010, pet. ref'd) (noting the need for exhaustion of less-drastic alternatives prior to a mistrial including "[t]he use of a 'dynamite' charge, or *Allen* charge, [a]s a[n] alternative that is less drastic than declaring a mistrial, but stronger than merely instructing the jury to continue deliberating"). The instruction and continued deliberations proved successful, as the jury was able to resolve its differences and reach a unanimous verdict on three of the four counts.

As to "marathon deliberations," the jury was neither threatened with nor required to endure such unending sessions. *See, e.g.*, *United States v. Eghobor*, 812 F.3d 352, 358 (5th Cir. 2015) (quoting *United States v. Scruggs*, 583 F.2d 238, 240 (5th Cir. 1978), for the rule that the Fifth Circuit will "uph[o]ld versions of [the *Allen*] charge so long as they avoid the pitfalls of coercive deadlines, threats of marathon deliberations, or pressure for surrender of conscientiously held minority views").[31]

---

[31]Although the Court of Criminal Appeals has held that the impartial-jury requirements in the United States and Texas Constitutions are functionally the same, we are mindful of the state's freedom to guarantee greater rights under the Texas Constitution and to "reject federal holdings as long as state action does not fall below

Rather, the trial court demonstrated a willingness to allow the jury to break for the day upon request. Although the jury signaled its difficulty in reaching agreement on multiple occasions, it repeatedly asked to recess for the day rather than reporting an impasse—thereby indicating a willingness of the jury to "sleep on it" and, with additional time, try to work through its disagreements. *See Hollie v. State*, 967 S.W.2d 516, 523 (Tex. App.—Fort Worth 1998, pet. ref'd) (per curiam) (noting, in analysis supporting approval of *Allen* charge, that the trial court sent the deadlocked jurors home, "presumably where they could 'sleep on it,'" prior to issuing an *Allen* charge). Each time such a recess was requested, the trial court granted permission.

Then, when the jury indicated it was deadlocked on count four, the trial court directly asked the presiding juror if he thought the jury could reach a verdict if it had additional time and received additional instructions from the court. The entire jury

---

the minimum standards provided by federal constitutional protections." *Heitman*, 815 S.W.2d at 682–90; *see also Jacobs*, 560 S.W.3d at 210; *Ex parte Davis*, 957 S.W.2d 9, 12 (Tex. Crim. App. 1997). Thus, to the extent that we cite federal case law in our combined analysis of Thetford's federal and state constitutional challenges to the *Allen* charge, such case law is not binding in our interpretation of the Texas Constitution. *Cf. Heitman*, 815 S.W.2d at 690 (holding that Texas courts interpreting the search and seizure protections in the Texas Constitution are not bound to "blindly follow the Supreme Court's decisions" interpreting the parallel guarantee in the Fourth Amendment). Rather, we "borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful," but rely on such case law only for guidance. *Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992) (interpreting constitutional right to freedom of speech in civil case and encouraging state courts to borrow from helpful federal case law but to "clearly not[e]" the appropriate role of federal case law when construing the parallel provisions of the Texas Constitution).

witnessed the inquiry in open court, and the entire jury heard the presiding juror respond in the affirmative. It was only after—and in fact because of—the presiding juror's express statement that he felt that additional instructions might help the jury reach a verdict that the trial court issued the *Allen* charge. The court indicated as much by stating, "*based upon what you've told me,* I'm going to send you back [to continue deliberating]." [Emphasis added.] The exchange thus evidenced that the jury was willing to continue deliberations with additional instructions and that the trial court was willing to accept a deadlock and declare a mistrial if the jury could not reach a unanimous verdict. There is no implication in this record that the trial court intended to hold the jury forever.[32]

The trial court also indicated its willingness—but understandable hesitance—to declare a mistrial in the text of the *Allen* charge itself. In the charge, the trial court expressly contemplated a scenario in which the jury "finds itself unable to arrive at a unanimous verdict as to Count Four," making it "necessary for the Court to declare a mistrial and discharge the jury as to Count Four only." The *Allen* charge explained that a mistrial would not be a cataclysmic event—it would not prevent the trial court from receiving the jury's verdicts on counts one through three, nor would it absolve

---

[32]The *Allen* charge accurately reflected that mistrials are disfavored and should be avoided if possible. *See Howard*, 941 S.W.2d at 125 ("An *Allen* charge is designed to foster or 'coerce' this debate and to *circumvent a mistrial.*").

the defendant of the charges alleged in count four—with the caveat that a future jury would not find the issues "any easier to decide than you have found them."

Furthermore, when the trial court issued its one and only *Allen* charge, it closed by instructing the jury "to continue deliberations in an effort to arrive at a verdict as to Count Four that is acceptable to all members of the jury, *if you can do so without doing violence to your conscience.*" [Emphasis added.] Such a cautionary instruction also helped guard against coercion. *See West*, 121 S.W.3d at 109 (holding *Allen* charge not coercive and noting that the court "carefully concluded" the charge by similarly instructing the jury not to "d[o] violence to your conscience"); *Odom*, 682 S.W.2d at 447–48 (holding *Allen* charge not coercive and emphasizing that trial court twice instructed the jury not to "do violence to your conscience"); *see also Dease v. State,* No. 01-02-00096-CR, 2003 WL 124817, at *5 (Tex. App.—Houston [1st Dist.] Jan. 16, 2003, pet. ref'd) (mem. op., not designated for publication) (distinguishing noncoercive *Allen* charge from prior case involving coercive *Allen* charge by emphasizing that the noncoercive charge "contained two reminders from the trial court that the jurors should 'not do violence to [their] conscience[s]'"); *Roll*, 2000 WL 34251143, at *5 (listing and recognizing inclusion of cautionary instruction in *Allen* charge as a factor weighing against coercive effect). The trial court granted the jury's request to break for the day less than ninety minutes later. The following morning, the trial court assured the jury that it would recess in time to accommodate a juror's scheduling conflict that evening.

Nothing about the trial court's communications threatened the jury with interminable confinement.

Nor did the trial court implicitly or explicitly convey displeasure with the minority, attempt to single out minority jurors, or otherwise pressure the minority to go against its conscience. *Cf. Barnett*, 161 S.W.3d at 134 (finding coercion where the trial court extensively polled the jury regarding the lack of unanimity and told two hold-out jurors it had a "problem" with them). In fact, nothing in the record indicates that the trial court had knowledge of the identity of the minority juror or jurors or the "nature or extent of [the jury's] division" at all. *See Lowenfield*, 484 U.S. at 240, 108 S. Ct. at 552 (recognizing that *Brasfield v. United States*, 272 U.S. 448, 450, 47 S. Ct. 135, 136 (1926) implicitly approved inquiries as to whether further deliberations would be beneficial because such inquiries do not "requir[e] the jury to reveal the nature or extent of its division").

Although *Allen* charges have been upheld even when the trial court had unsolicited knowledge of the numerical division or the identities of the minority jurors, the record does not reflect that the trial court here knew either. *Cf. Hollie*, 967 S.W.2d at 522 (recognizing that, even when a judge is aware of the numerical split, "the fact that a trial court does not search out and publicly target, specifically or inferentially, specific members of the jury and by a supplemental *Allen* charge urge *them* to re-evaluate *their* views, is very important vis-a-vis coercion"). The trial court did not poll the jury as to whether further deliberations would be beneficial—a

practice which has been approved by the United States Supreme Court, but which nonetheless could have increased the risk that the minority jurors might feel threatened or the trial court might gain unsolicited knowledge regarding the extent of the jury's division. *See Lowenfield*, 484 U.S. at 234–35, 239–41, 108 S. Ct. at 549, 552 (holding that trial court's poll of the jury as to whether "further deliberations will enable you to arrive at a verdict" was not coercive because it did not inquire as to where the jurors stood on the merits of the verdict, even though the trial court polled the jury on the question and received eleven answers in the affirmative and one in the negative). Given the jury's firsthand observation of the presiding juror's exchange with the court and the trial court's apparent lack of knowledge about the nature or extent of the jury's division, the *Allen* charge could not have reasonably been understood as publicly identifying, chastising, threatening, or singling out the minority juror or jurors. *Compare Howard*, 941 S.W.2d at 124 (finding no coercion where "the trial court did not probe the jury or attempt to identify the minority jurors"), *with Barnett*, 161 S.W.3d at 134 (finding coercion where the trial court extensively polled the jury after the lack of unanimity was revealed, and singled out two hold-out jurors, asking them whether they could change their votes if sent back to deliberate further).

The duration of the jury's post-*Allen* charge deliberations further indicates the absence of coercion. Contrary to Thetford's claims, the jury did not return a verdict "relatively quickly" after the *Allen* charge, but deliberated another five and a half hours before reaching a decision. Courts have held shorter post-*Allen* charge

44

deliberations to indicate an absence of coercion—including in many of the federal cases cited by Thetford as purported support for her argument. *See United States v. Russell*, 971 F.2d 1098, 1108 (4th Cir. 1992) (holding that approximately three hours of post-*Allen* jury charge deliberation "provides adequate assurance that the jury was not improperly coerced by the district court's instruction"); *United States v. Robinson*, 560 F.2d 507, 517–18 (2d Cir. 1977) (holding that more than four hours of jury deliberation after the trial court's second *Allen* instruction was a "strong indicatio[n] that the effect of the charge was minimal"); *United States v. De Stefano*, 476 F.2d 324, 337 (7th Cir. 1973) (holding that four hours of post-*Allen* jury charge deliberation indicated that "instead of it having the coercive effect of the majority running roughshod over the minority, the supplemental charge caused the jury to take additional time to deliberate"); *United States v. Pope*, 415 F.2d 685, 690–91 (8th Cir. 1969) (holding that almost four hours of post-*Allen* jury charge deliberation indicated the absence of a coercive effect); *see also Minze*, 2016 WL 4474352, at *5 (holding appellant failed to demonstrate coercion where post-*Allen* charge deliberations lasted only fifteen to twenty minutes).

Moreover, the jury's post-*Allen* notes are consistent with continued deliberations. Although the jury did not ask to review any additional exhibits or testimony after receiving the *Allen* charge, it sent the trial court two notes—first stating that it "still ha[d] not come to one decision," and later expressly reaffirming that it was "still deliberating on count #4 and ha[d]n[']t come to a decision." Such

45

notes indicate not only that the jury continued deliberating after the *Allen* charge was given, but also that the minority juror or jurors continued to hold to their positions—suggesting the minority did not interpret the *Allen* charge as a coercive mandate to yield. *See, e.g.*, *Martin*, 2012 WL 5358862, at \*18 (holding trial court did not err by instructing deadlocked jury to continue deliberating and noting that "[t]he fact that the jury asked to see evidence and have testimony read back [after the supplemental charge was given] is further proof that they had not yet finished deliberating"); *Minze*, 2016 WL 4474352, at \*5 (overruling challenge to *Allen* charge and noting, "[e]ven though the jury did not request to review any evidence, nothing in the record indicates that the jury did not deliberate during the interval of fifteen to twenty minutes before rendering the verdict").

After the verdict had been announced, the trial court polled the jury at Thetford's request, and each juror confirmed that it was his or her verdict. Such affirmations served as a final, post-verdict confirmation of the absence of coercion. *See, e.g.*, *Rosales v. State*, 548 S.W.3d 796, 805 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (noting, in analysis and approval of *Allen* charge, that jury was polled and each juror confirmed that the verdict was his or hers).

In sum, based on our review of the totality of the circumstances, we hold that the trial court's *Allen* charge did not result in any actual jury coercion. We thus overrule Thetford's final point.

46

## III. Conclusion

Having overruled each of Thetford's three points, we affirm the judgments of the trial court.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 28, 2021

47